MARYLAND DEPARTMENT OF NATURAL
RESOURCES, WATER RESOURCES
ADMINISTRATION *v.* JOHN
J. HIRSCH ET AL.

[No. 1044, September Term, 1978.]

*Decided May 10, 1979.*

458

The cause was argued before LOWE, LISS and WILNER, JJ.

*Richard E. Rice, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Edward F. Lawson* and *Thomas A. Deming, Assistant Attorneys General,* on the brief, for appellant.

*Amicus curiae* brief filed by The Chesapeake Bay Foundation Inc., *Betty Cox Higginbotham, Staff Attorney,* on the brief.

*John J. Hirsch* for appellees.

WILNER, J., delivered the opinion of the Court.

The State of Maryland, through the Water Resources Administration of the Department of Natural Resources,

appeals from an order of the Circuit Court for Anne Arundel County dismissing its bill of complaint against John J. Hirsch and others.[1] The reason for and effect of that dismissal, as expressed in the court's "Memorandum of Opinion and Order", is that the Department's rules and regulations pertaining to the filling of wetlands in Anne Arundel County were not applicable to private wetlands previously filled by Mr. Hirsch, and that, as a result, the Department was powerless to require him to restore those lands to their natural (or prefilled) state. The Memorandum Opinion recognized the prospective application of those rules and regulations to the extent of concluding that Hirsch would have to obtain a permit before engaging in any further filling of such wetlands; but this was not reflected in the actual Order, which merely dismissed the bill of complaint.

Each party has raised a number of questions in this appeal, some of which overlap. The real issues are these: (1) Did Hirsch fill wetlands; and (2) if so, did he do it unlawfully? The crux of the second issue is whether, because of alleged deficiencies in the giving of public and private notice, the legal prohibitions against filling wetlands without official permission are applicable to Hirsch's lots or enforceable against him?

Some general background would be helpful to an understanding of these issues.

In its 1970 session, the General Assembly enacted Laws of Md. (1970), ch. 241, which, as its title states, was at least in part, "to provide a State policy for the preservation of wetlands in the State; [and] to regulate the filling and dredging of wetlands . . . ." This Act, a comprehensive one, was codified initially as §§ 718-731 of article 66C of the Code, and now appears as Title 9 of the Natural Resources article.[2]

---

1. The appellees here (respondents below) are John J. Hirsch and various members of his family. For convenience only, we shall refer to them collectively in the person of Mr. Hirsch.

2. Because the events relevant to some of the issues in this appeal occurred before the recodification, it will be necessary in some instances to refer to the original provisions as set forth in former article 66C. For convenience, when this is done, we shall note as well a corresponding reference to the current provision in the revised article.

The Act did not (and still does not) define the term "wetlands". It recognized, however, and was largely built around, a distinction between "State wetlands" and "private wetlands"; and those terms are defined. "State wetlands" was defined in § 719 (a) of art. 66C [N.R., § 9-101 (m)] to mean

"all land under the navigable waters of the State below the mean high tide, which is affected by the regular rise and fall of the tide. Such wetlands, which have been transferred by the State by valid grant, lease or patent or a grant confirmed by Article 5 of the Declaration of Rights of the Constitution of Maryland, shall be considered 'private wetland' to the extent of the interest so transferred."

"Private wetlands", conversely, was defined in § 719 (b) [N.R., § 9-101 (j)] as,

"all lands not considered 'State wetlands' bordering on or lying beneath tidal waters, which are subject to regular or periodic tidal action and which support aquatic growth. These include wetlands, which have been transferred by the State by a valid grant, lease or patent or a grant confirmed by Article 5 of the Declaration of Rights of the Constitution of Maryland, to the extent of the interest so transferred."

Both types of wetlands are subject to regulation (limitations as to use) under the Act, but the type of regulation, and the procedures for implementing it, differ. With respect to State wetlands, the relevant statutory provision was § 721 of art. 66C [N.R., § 9-202], which stated simply that "[i]t shall be unlawful for any person to dredge or fill on State wetlands, except to the extent that he has been issued a license to do so by the Board of Public Works." The balance of the section specified the procedures for obtaining such a license.

The regulation of private wetlands was committed to the Department of Natural Resources, rather than to the Board of Public Works; and, in this regard, a number of duties and

powers were imposed upon and vested in the Secretary of that department. Section 722 [N.R., § 9-302 (a)] authorized the Secretary, after consultation with the Maryland Agricultural Commission, to "promulgate rules and regulations governing dredging, filling, removing or otherwise altering or polluting private wetlands." These rules and regulations "may vary as to specific tracts of wetlands because of the character of such wetlands."

Section 724 [N.R., § 9-301] required the Secretary to make an inventory of "all private wetlands within the State" and to prepare maps showing the "boundaries of such wetlands". The balance of that section and section 725 [N.R., § 9-305] then set forth a procedure for public hearings, notice to affected landowners and to the public generally with respect to the designation of the wetlands and to the proposed rules and regulations governing them, and for administrative and judicial review of these determinations and promulgations. As originally enacted, all of this clearly pertained only to *private* wetlands, which were all that the Secretary was to delineate and regulate. In 1972, however, the Secretary's duties were broadened to cover, in some respects, State wetlands as well. By Laws of Md., 1972, ch. 414, the General Assembly directed the Secretary to "delineate the landward boundaries of *all* wetlands in the State" and to show the "landward boundaries of *such* wetlands" on the maps to be prepared by him. (Emphasis supplied.) The term "landward boundary of wetlands" was defined to mean "the common boundary between wetlands as defined in this section and lands not included within the definitions of wetlands appearing in this section [719]." Rather than an "inventory" or private wetlands, the 1972 Act required a mapping of *all* wetlands, although it is implicit from § 724, as amended in 1972, that, as part of the mapping process, the boundaries of the private wetlands were to be separately designated.

Section 724 then set forth the following procedural requirements:

".... Upon completion of the private wetlands landward boundary maps for each subdivision and adoption of proposed rules and regulations

governing activities on such wetlands as provided by Section 722, the Secretary shall hold a public hearing in the county of the affected wetlands. The Secretary shall give notice of such hearing to each owner as shown in tax records of all lands designated as wetland as shown on such maps, by registered mail not less than thirty days prior to the date set for such hearing. The notice shall include the proposed rules and regulations. The Secretary shall also cause notice of such hearing to be published at least once not more than thirty days and not fewer than ten days before the date set for such hearing in a newspaper or newspapers published within and having a general circulation in the county or counties where such wetlands are located. After considering the testimony given at such hearing and any other facts which may be deemed pertinent and after considering the rights of affected property owners and the purposes of this subheading, the Secretary shall establish by order the landward bounds of each of such wetlands and the rules and regulations applicable thereto. A copy of the order, together with a copy of the map depicting such boundary lines, shall be filed among the land records in all counties affected after final appeal of such, if any, has been completed. The Secretary shall give notice of such order to each owner of record of all lands designated as wetlands by mailing a copy of such order to such owner by registered mail. The Secretary shall also cause a copy of such order to be published in a newspaper or newspapers published within and having a general circulation in the county or counties where such wetlands are located."

Section 725 [N.R., § 9-305], as amended, permitted any person "having a recorded interest in land affected by any such rules and regulations" to appeal both the rules and regulations "and the designation of his land as wetlands" to the Departmental Board of Review, and, if dissatisfied with the decision of that Board, to seek judicial review of "whether

such rules or regulations so restrict the use of his property as to deprive him of the practical uses thereof and are therefore an unreasonable exercise of the police power, because the order constitutes the equivalent of a taking without compensation." With respect to both levels of review, the statute provided a time period within which such review must be sought.

Finally, in terms of this preliminary background, § 726 (as amended in 1972) [N.R., § 9-306], required any person "proposing to conduct an activity upon *any wetland* which is not permitted by rules and regulations adopted under the provisions of Section 722" to apply for a permit from the Secretary. The application was required to show, among other things, a description of the proposed work and "a map showing the areas of wetland directly affected, with the location of the proposed work thereon. . . ." Section 726 then provided:

> "Within thirty days of receipt of an application, the Secretary shall notify the applicant, in writing, of the extent of State wetlands involved in the proposed activity and indicate the method of compliance with the license requirements of Section 721 of this subtitle. If the applicant claims that any part of the designated State wetlands is private wetlands by virtue of the existence of a valid grant, lease, or patent, or a grant confirmed by Article 5 of the Declaration of Rights of the Constitution of Maryland, the Secretary of Natural Resources shall investigate and determine the validity of such claim and shall notify the applicant of his determination. If, within thirty days after receipt of the Secretary's determination, the applicant files with the Secretary a written objection to the determination, the Secretary shall promptly institute an appropriate proceeding in a court of competent jurisdiction to determine whether the lands covered by the application, or part thereof in dispute, are State or private wetlands."

With this statutory background, we can examine what actually (or allegedly) occurred here.

The property in question consists of Lots 18 through 24 as shown on a recorded subdivision plat of Long Point on the Magothy. They border on Cornfield Creek, which is a tributary of the Magothy River, and are located in Anne Arundel County. From 1962 to September, 1972, these lots were owned by Emerson Development Company, a Maryland corporation. On September 27, 1972, title was conveyed to one Ann Szymanski, who was the secretary and treasurer of Emerson, and the wife of its president. The deed, which was given without consideration, was not recorded until October 31, 1972.[3] Mrs. Szymanski, individually, remained the owner of the lots until July 22, 1974, when she conveyed them to Mr. Hirsch and various members of his family.

Following the enactment of the 1970 law and its subsequent amendment, the Secretary set about the duties imposed upon him by §§ 722 and 724 — mapping the State and private wetlands and proposing rules and regulations with respect to them. Tentative maps were prepared, and, based upon those maps, the records of the Department of Assessments and Taxation revealed 1,030 owners of what the Secretary considered to be the wetlands situate in Anne Arundel County.

The lots in question here — more accurately, a part of the lots in question here — were in fact designated as wetlands on the maps prepared by the Secretary, although there was no delineation of whether they were State or private wetlands. The records of the Department of Assessments and Taxation, relied upon by the Secretary to determine ownership (as called for in § 724) showed their owner to be "Emerson Development Co., c/o David J. Preller" with an address of 112 Equitable Building, Baltimore. Based upon this information, there was sent to Mr. Preller, on or about October 25, 1972, a notice of a public hearing scheduled at

---

3. The trial court found that this deed was recorded on October 3, 1972, rather than October 31. This may be a typographical error in the court's Memorandum, for there was no evidence to support the October 3 date. The deed itself shows that it was recorded on the 31st.

Glen Burnie High School for November 28, 1972, and a copy of the Secretary's "Proposed Order Establishing Wetland Boundaries, and Proposed Rules and Regulations." Mr. Preller was the attorney and resident agent of the corporation.

There is no genuine dispute as to the adequacy of the notice itself [4] or that, based upon the tax records at the time, it was sent to the proper person. Unfortunately, Mr. Preller had, some four years earlier, moved from the Equitable Building, and apparently never actually received the notice. The "return receipt" was signed by someone on behalf of what we presume was a successor tenant of the Equitable Building office formerly occupied by Preller.

In addition to this personal notice, correctly sent but never received, the Secretary caused public notice of the scheduled hearing to be given through advertisements placed in the Annapolis Evening Capital, the Maryland Gazette, the Baltimore News American, the morning and evening Baltimore Sunpapers, and the Washington Post — all being newspapers of general circulation in and around Anne Arundel County. There is no dispute that this public notice complied with the specific requirement for it in § 724.[5]

The hearing took place as scheduled (without the presence of either Preller or Szymanski), and, in due course, the Secretary issued an order designating the wetlands in the county and promulgating rules and regulations pertaining to them. Section IV of the Rules and Regulations provides, in relevant part, that unless done pursuant to a permit issued by the Secretary pursuant to Section VI, no person may "fill, place, dump or discharge on the wetlands encompassed in this Order any loam, peat, sand, gravel, soil, or other similar substance" or "perform any act or use the wetlands . . . in a

---

4. Hirsch did point out that the notice was sent by certified mail rather than registered mail, as required by the statute. In the context of the issues in this case, this deficiency, if it is one, is of absolutely no importance. There is nothing in the record to suggest that if the notice had been sent by registered mail, it would have been delivered any differently.

5. The record shows that, in addition to the "legal notice" itself, several of these newspapers also carried a more general (and more legible) news story about the scheduled hearing.

manner which would destroy the natural vegetation, substantially alter existing patterns of tidal flow, or otherwise alter or permit the alteration of the natural and beneficial character of such wetland."

The record shows that the Secretary issued his final order on January 25, 1973. A copy of this order was mailed to "the 1030 property owners" on September 4, 1973.[6] At those times — in January and in September — Mrs. Szymanski still owned the lots, but she never received the notice. The notice was sent again to Mr. Preller, at the Equitable Building address he had vacated nearly six years earlier, although there was evidence to indicate that he may have received this notice. If he did, he never notified Mrs. Szymanski. The explanation for this routing of the notice was given by Mr. Harold Cassell, a biologist employed by the Department of Natural Resources.

According to Mr. Cassell, address labels were made for each of the 1,030 owners to whom the first notice was mailed in October, 1972; and, unless the Department received some affirmative indication that the addressee was not, in fact, the property owner, the same labels were used for the second mailing. In the 50 or so cases in which the original letter was returned undelivered or the recipient advised the Department that he no longer owned the property, a further inquiry was made to determine ownership. Otherwise, despite the passage of 11 months and the requirement in § 724 that this second notice be given to "each owner of record" rather than "each owner as shown in tax records", the same label was used, without even a further check with the tax records.[7] Thus it was that, in terms of Mrs. Szymanski, a copy of the order was *not* sent to "each owner of record."

---

6. There is no explanation in the record of the approximate nine-month delay in mailing the order, other than "an administrative situation beyond our control", but that lapse is not itself an issue in this case.

7. One exhibit admitted into evidence (No. 53A) is a certified copy of the county assessment records for these lots reflecting, as of October 31, 1972, the transfer of title to Mrs. Szymanski. The inference, we presume, is that had the Department rechecked even the tax records before sending the second notice, it would have discovered the name and address of the true owner of record.

Whether the Department complied with the additional requirement that the order and map be "filed among the land records" is not so clear. Indeed, that is the major point in dispute.

Mr. Cassell stated that on August 31, 1973, he delivered to Garrett Larrimore, Clerk of the Circuit Court for Anne Arundel County, a copy of the Secretary's order (establishing the boundaries and adopting the rules and regulations), the text of the rules and regulations, the 162 maps depicting the designated wetlands in the county, and an index to those maps. He got no receipt from the Clerk, but he did write a memorandum to himself: "Anne Arundel County Wetlands Maps number 1 through 162 to the Clerk of the Circuit Court on 8/31/73." This memorandum says nothing about the Secretary's order.

None of these items — order, maps, rules and regulations — were actually "recorded" among the land records. The maps were enclosed in manila envelopes, sequentially numbered from 1 to 162; and these were placed in a file cabinet in the office of an assistant clerk, in an area not accessible to the general public or to title searchers. The rules and regulations were simply misplaced, or lost. If a copy of the order was, in fact, delivered to the Clerk, no one seems to know what became of it. Mrs. Marshall Nelker, a professional title examiner who searched the title to the lots in question in connection with Hirsch's purchase of them, testified that, when she performed her search in 1974, there was no way (save by accident) that she could possibly have come across the fact that parts of those lots had been designated as wetlands or that they were subject to rules and regulations adopted by the Secretary. Apparently, it was not until 1975 — perhaps as a result of this case — that copies of the Secretary's order, the rules and regulations, and an index of some sort to the maps were posted in the Clerk's office in a manner calculated to make them known to title searchers or to the public at large.

It was therefore the case that, when Hirsch and his family purchased these lots from Mrs. Szymanski, despite what appears to have been a proper and diligent title search, they

were unaware that part of them had been designated as wetlands and were therefore restricted as to use. They soon learned, however.

Thomas Boone, a regional inspector for the Water Resources Administration, testified that on July 30, 1974, his office received a complaint regarding a filling operation and bulkhead construction in an area along Cornfield Creek. He turned the matter over to one of his inspectors, a Bob Smith. Smith went out to the property — Hirsch's lots — on August 9, 1974, took some photographs, and reported back to Boone. Boone called and spoke with Hirsch's wife. He testified:

> "I advised Mrs. Hirsch that as the photographs looked to me that there had been no violation of wetlands *at this time.* However, *if anything was intended to go past where this brush had been placed* that a wetlands license or permit should be applied for, at least contact our wetlands permit office." (Emphasis supplied.)

Boone said he advised Mrs. Hirsch that "if any filling was done in wetlands that a permit or license would be required by the State of Maryland." She responded, according to Mr. Boone, that "she did not think there was going to be any filling done past where the brush had been piled but they did intend to do some filling."

Mrs. Hirsch had a much different recollection of this conversation. She stated that Boone never mentioned the subject of wetlands, but told her that if they "planned to dump any dirt that we needed this permit from Anne Arundel County. . . ." Mrs. Hirsch was not asked, and did not explain, why an inspector for the State Water Resources Administration might have called her in connection with the need for a *county* grading permit.

No further contact was had until November 30, 1974, when, pursuant to a further complaint, Ronald Parise, a regional chief of the Administration's enforcement division, visited the site and "observed a filling operation in progress." He suspected that the fill was on private wetlands, but was not certain of it; and he proposed to return later in the week with

some staff biologists "to make a determination of whether or not it was wetlands and whether or not there was a violation." He asked Hirsch at the time not to fill one portion of what he belived to be a marsh. Parise, accompanied by Alan R. Clark, a staff biologist, returned on December 3. Based upon the wetlands maps and the field work done on that second visit, Parise determined that wetlands had indeed been filled, and that no permit had been requested or granted to authorize such filling.

Upon this determination, the Water Resources Administration, on December 12, 1974, issued an order for Hirsch to cease and desist all filling activities and to present a plan for the removal of the previously placed fill and for the restoration of the wetlands. Hirsch requested, and received, an administrative hearing to protest this order. The hearing officer concluded, however, that a violation of the Act did occur and that the order was appropriate. A supplemental order, similar to that previously issued, was then entered. When Hirsch gave no indication of complying with the order, the Administration filed this proceeding to enforce it.

With this background, we may turn to the basic issues.

## I. Was the court correct in concluding that private wetlands were filled by Hirsch?

This question, as framed by us, is somewhat of a composite of several subsidiary questions raised by one or the other of the parties. Hirsch argues that his lots did not contain wetlands at all, and that the evidence so demonstrated, but, to the extent that some part of them were wetlands, by virtue of an 1814 patent, they would be private and not State wetlands. The State, of course, maintains that the existence of wetlands was shown, but it objects to the court's failure to determine that some part of them were State wetlands.

Hirsch premises his first argument — that there were no wetlands on his lots — upon the testimony of Ronald Parise who, it will be recalled, visited the property on a number of occasions in an effort to determine whether Hirsch's filling operation was in violation of State law. Parise had concluded, after his inspection on December 3, 1974, that wetlands had

been filled. He returned to the property on February 27, 1975, which was the anticipated date of the spring high tide, and, together with Hirsch, measured the rise and fall of the tide on Hirsch's lots. Parise admitted that, on that one occasion, the tide, at its highest point, did not reach the seaward property line of Hirsch's lots, and therefore, of course, did not reach the part of those lots, landward of that property line, that had been filled. From this, Hirsch argues that his land is not "below the mean high tide" or "affected by the regular rise and fall of the tide"; nor is it "subject to regular or periodic tidal action"; and therefore does not fall within the statutory definition of either State or private wetlands.

It is first to be noted that this one test did not alter Mr. Parise's belief that wetlands had, in fact, been filled. He apparently had at least one, possibly more than one, explanation for this occurrence, but was not questioned in detail about them. In contrast to the inference sought to be drawn from this one observation, there was ample evidence offered to show that these lots did contain wetlands. This evidence, obviously accepted and credited by the court, is summarized in the court's memorandum as follows (footnotes omitted):

> "Certain vegetation is alleged to characterize wetlands. In 1971 the Department contracted with Raytheon Corporation to identify wetlands using aerial photographs. In turn, Raytheon subcontracted with Dr. Jack McCormick, an ecology expert and botanist, to interpret Anne Arundel County's photographs. McCormick's project identified wetlands on the subject area. Exhibits 22-25. The State also introduced photographs of respondents' property taken in 1974 on which McCormick identified two types of wetland vegetation — *typha angustifolia,* or narrow-leaved cattails and *spartina alterniflora,* or salt marsh cord grass. Exhibits 2, 2a, 3, 3a, 4, 4a, 6, 6a, 7, 8a and 9.

> "The State also introduced evidence regarding tidal information. James Hubbard, Chief, Tidal Datum, Oceanographic and Atmospheric

Administration, testified to the mean high water determination, which is the average high water over a nineteen year period, 1941-1959, measured locally at a control station in Baltimore. From these figures and from tidal bench marks in Cornfield Cree[k], Hubbard was able to identify the tidal range for the creek, clearly establishing the site as a tidal area. Exhibit F shows the State's contentions of where the mean high water mark was before and after fill.

"Joe Gibson, soil scientist from the U.S. Department of Agriculture, conducted soil borings in an attempt to establish how much tidal marsh was under the fill. These borings, indicated as numbered points on Exhibit F, showed soil similar to sites which Gibson mapped as tidal marshes. From this evidence — vegetation, tidal records and soil borings — the State concluded that part of the Hirsch property was wetlands.

"While respondents disputed details of the testimony, none of their evidence seriously refutes the State's contention that the wetlands were filled. Their expert, Dr. Alfred E. Schulyer, acknowledged that part of the property was wetlands based on his observation and examination of photographs. Exhibits 2 and 3. *Considering all the evidence, the Court finds that the Hirsch property contained wetlands prior to fill.*" (Emphasis supplied.)

We cannot say that the court was clearly erroneous in making this factual determination. There was certainly substantial evidence to support it, notwithstanding that there was evidence in derogation of it. Maryland Rule 1086.

Ordinarily, in an enforcement action under N.R. § 9-501, as opposed to a "permit" action under N.R. § 9-306, that threshold determination — that wetlands of some type were filled — would suffice to justify an order requiring restoration of the wetlands. It would make little (or no) difference whether the wetlands in question were State or private. Section 9-501 (d) provides that any person who

knowingly violates "any provision of this title", which would include filling State wetlands without a license from the Board of Public Works (§ 9-202) or filling private wetlands without a permit from the Secretary (§ 9-306), "is liable to the state for restoration of the affected wetland to its condition prior to the violation if possible."

The distinction became important in this case only because of the court's subsequent conclusion that, because the maps and regulations were not recorded in accordance with Real Property article, § 3-101, they were not effective to impose restrictions on *private* wetlands. This, of course, made the question of whether these wetlands were State or private a pivotal one in terms of whether the State was entitled to restoration. Because we believe that the court erred in its subsequent determination, however, the distinction loses its importance, and indeed becomes moot. We need not, therefore, consider the questions raised by the State as to who has the burden of proving the distinction and what the nature and quantum of that burden is. We note, however, that there was substantial evidence from which the court could have reasonably concluded that the wetlands in question were private, rather than State wetlands.[8]

## II. Validity, Applicability and Enforceability of the Secretary's Rules and Regulations

Here too there are a number of subsidiary questions. The trial court concluded that the rules and regulations were not enforceable with respect to those parts of Hirsch's lots already filled because they were not recorded in accordance with Real Property article, § 3-101. The State claims that the recording statute is not applicable — that N.R. § 9-301 (c) requires only that various documents be "filed" among the

---

8. The court considered the wetlands as private because it believed that the State had failed to satisfy its burden of proving that they were State wetlands. It therefore omitted to consider the effect of an 1814 patent through which, according to other evidence, title to these lots had been conveyed by the State. Because of its mootness, we shall not address the question on its merits. We do no more than observe that the ultimate determination of the court that these were private wetlands, quite apart from the rationale employed to reach that determination, was supported by substantial evidence; and thus we cannot say that the ultimate determination was clearly erroneous. Maryland Rule 1086.

land records, not that they be recorded, and that they were properly filed when delivered to the Clerk.

Hirsch counters that, under that circumstance, the whole scheme is unconstitutional (at least as it was implemented in this instance), because the State would thereby be placing significant restrictions upon privately owned land without adequate notice to the landowner, or to prospective landowners. His argument is that no one in the chain of title to these lots — not Emerson Development Co., not Ann Szymanski, and not he — ever received the required personal or constructive notice of either the Secretary's designation of wetlands or his rules and regulations limiting their use.

We think it clear that there were deficiencies in carrying out the legislative intent and the legislative mandate expressed in § 724. Neither the Department nor the Clerk did what was expected of them. The question, however, is the extent to which Hirsch may avail himself of these lapses. We shall consider this in stages, by looking at the various requirements set forth in § 724.

(a) *First Personal Notice*: Section 724 required the Secretary to give notice of the public hearing (together with a copy of the proposed rules and regulations) "to each owner as shown in tax records of all lands designated as wetland as shown on such maps, by registered mail not less than thirty days prior to the date set for such hearing." It is clear from the facts recounted above that the Secretary sufficiently complied with this requirement.

(b) *First Public Notice*: Section 724 then required the Secretary to cause notice of the hearing to be published at least once in one or more newspapers having a general circulation in the county. Hirsch does not contest that this public notice was properly given.

(c) *Public Hearing*: There is no dispute that the public hearing required under § 724 was held in compliance with the statutory mandate.

(d) *Filing and Second Personal and Public Notice*: Once the landward boundaries of the wetlands were established and the rules and regulations promulgated, three things were to

be done: (i) a copy of the order, together with a copy of the map depicting the boundary lines "shall be filed among the land records" in the county, (ii) the Secretary was to "give notice of such order to each owner of record of all lands designated as wetlands by mailing a copy of such order to such owner by registered mail"; and (iii) the Secretary was to cause a copy of the order to be published in one or more newspapers of general circulation in the county.

We shall consider these three directions in reverse order. There is no dispute that the Secretary complied with the third requirement. A copy of his order was published in the Anne Arundel Times, which apparently is a newspaper of general circulation in the county.

It is equally clear that the Secretary did *not* comply with the second of these directions, at least not in the manner which we think the General Assembly intended. Even if the phrase "owner of record" can reasonably be construed to mean owner disclosed by the tax records, as opposed to owner whose title is apparent from the land records, Emerson Development Co. was not the "owner of record" when this second notice was mailed, and had not been the owner of record for nearly a year. The Department's effort to be efficient by preparing several labels at one time is commendable; but when the second notice is not sent until eleven months after the first, its efficiency in this regard becomes somewhat meaningless. It was not entitled to presume that no changes in ownership had occurred in the interim.

The problem, from Mr. Hirsch's point of view, is that this departmental oversight is not a deficiency about which he has any standing to complain. He was not the owner at the time; he was not entitled to the notice. The Department's failure to recheck the tax record (or the land records) and send the second notice to Mrs. Szymanski did not involve a breach of any duty it owed to Hirsch. The obvious purpose of this second notice was to enable the owner to take advantage of the rights of administrative and judicial review set forth in § 725; but those rights were limited to those persons then "having a recorded interest" in land affected by the rules and

regulations. Mr. Hirsch was not in that category. Neither was there any legal obligation on the part of Mrs. Szymanski to disclose the order to Mr. Hirsch, even if she had known about it; and thus we fail to see how the Department's failure to send the final order to her can create a legitimate complaint or defense on the part of her successor in title to whom no duty was owed in this regard by anyone.

The critical issues in this case are the nature of the "filing" requirement, the extent to which it was satisfied, and the consequence of any breach of it. This was the one form of notice designed to alert future potential owners rather than those in title at the time.

Real Property article, § 3-101 (a) provides, with exceptions not relevant here, that "no estate of inheritance or freehold, declaration or limitation of use, estate above seven years, or deed may pass or take effect unless the deed granting it is executed and recorded." The trial court concluded that the Wetlands Act "established a continuing restricted use on any property owner's land which had private wetlands", and that "[s]uch a use comes within the scope of Section 3-101 and must comply with it." The Department's failure "to properly record the documents in a manner which would put a prospective owner on notice of the restriction" is what "compel[led] the Court to deny the request for restoration."

We agree with the trial court that, in enacting the Wetlands Act, the General Assembly intended and provided for careful notice to affected landowners; but we disagree that it intended to make applicable the recording requirement in § 3-101 (a), or to condition the effectiveness of the Secretary's designations or his rules and regulations upon compliance with it.

At issue is the construction of and interrelationship between two statutes — Real Property article, § 3-101, and former § 724 [N.R. § 9-306]. In construing these statutes, we look to the natural and ordinary signification of the language used. We presume that the legislature meant what it said, not what it might have said but didn't say.

Real Property article, § 3-101 (a), speaks in terms of a *deed* conveying the estate or expressing the declaration or

476

limitation of use. It is the *deed* that must be recorded. A statute is not a deed; nor is an administrative order or rule or regulation issued pursuant to a statute a deed.

The distinction to be drawn in this instance is between restrictions arising from the acts or instruments of private parties (or entities acting in the manner of private parties) and those arising from the proper exercise of the police power of a sovereign or duly constituted governmental entity. The Court of Appeals has, it is true, often said that the design of the recording statute is that "all rights, incumbrances or conveyances, touching or in any wise concerning land, should appear on the public records." *See,* for example, *Hays vs. Richardson,* 1 G & J 366, 384 (1829); *Harbor Co. vs. Smith,* 85 Md. 537, 544 (1897); *Lowes vs. Carter,* 124 Md. 678, 684 (1915). But these cases, and others where similar broad expressions are made, have concerned private conveyances, covenants, plats, or restrictions — not limitations imposed by statute or by regulations or orders promulgated by governmental agencies pursuant to law. Many statutes either establish or provide for the establishment of restrictions on the use of land — zoning and planning ordinances and health and environmental control laws being prime examples. But there is no authority for the proposition that these laws, or the regulations or orders promulgated under them, *absent some further legislative direction,* must be recorded pursuant to § 3-101 in order for the restrictions embodied in them to be valid; and we see no reason why the Wetland laws should be treated any differently. Alternative forms of public notice of these governmentally imposed regulations and limitations are normally provided, thereby obviating the need to make the recording requirement applicable.

Section 3-101 (b) recognizes the availability of substitute methods of imposing restrictions on land. That subsection states: "Subsection (a) does not limit any other method of transferring or creating an estate, declaration, or limitation which is permitted by the law of the state except to the extent required by law." This requires another look at § 724, which, as noted, provides that the order and the maps be "filed among the land records."

The State argues, with considerable force, that "filed" and "recorded" are two quite different things, and that, consequently, as a matter of statutory construction, § 724 did indeed establish a different (and lesser) requirement. Although the words "file" and "record", in their various forms and tenses, have occasionally been used somewhat interchangeably, they have more frequently not been considered as synonyms but as implying or requiring different things. The word "recorded", in its ordinary usage, has been held to signify "copied or transcribed into some permanent book." *See Beatty v. Hughes,* 143 P. 2d 110, 111 (Cal. App. 1943). "Filing", on the other hand, signifies merely delivery to the proper official, possibly for the purpose of recording. *See Quynn v. Brooke,* 22 Md. 288, 294 (1864); *Covington v. Fisher,* 97 P. 615, 617 (Okl. 1908); *Blake v. R.M.S. Holding Corp.,* 341 So. 2d 795, 799 (Fla. App. 1977); *Troska v. Industrial Commission,* 484 P. 2d 12, 13 (Ariz. App. 1971); *McGee v. Southern Farm Bureau Casualty Ins. Co.,* 125 So. 2d 787, 791 (La. App. 1960).

Merrill on Notice recognizes the distinction. Section 1056 states:

> "Speaking generally, there are two ways of preserving instruments in the public archives as a source of notice. One is recording, that is, making a copy of a substantial abstract of the instrument as a part of the public records, the document then being returned to the person entitled to its possession. The other is filing, that is, retaining the paper itself permanently in the files of the appropriate office. Which method is requisite depends upon the terms of the applicable statute. Where recordation is provided for, filing is unnecessary and the instrument is notice if it is recorded though it is not kept permanently in the files. *Conversely, where filing is the specified method of preservation, recording is both unnecessary and futile.* Hence if such a paper is withdrawn from the files after being recorded, notice is defeated. In such registry acts, the option is extended to have the instrument either

filed or recorded. The directions of such statutes as to the indorsement necessary to indicate the method elected must be followed, but substantial compliance is adequate." (Emphasis supplied.)

More significant is that the same distinction was at least tacitly recognized in former Md. Annot. Code art. 17, § 1, which was in effect at the time the Wetlands Act (and the 1972 amendments to it) were enacted. Dealing with the duties of the clerks with respect to documents delivered into their possession, that section provided, in relevant part:

"Every clerk shall have the custody of the books and papers pertaining to his office, and shall carefully keep current and preserve the same; *he shall file all papers delivered to him to be filed, and shall record all judgments, decrees, deeds and writings which by law are required to be recorded* in the office of which he is clerk." (Emphasis supplied.) [9]

This distinction had meaning. The law — even the Real Property article — called for the recording of some documents, and only the filing of others. *Compare,* for example, §§ 3-101, 3-102, 3-105, 3-106, 3-107, 3-108, 3-109, 3-110, all providing for the *recording* of documents, and § 3-401 dealing with the *filing* of tax liens, or former § 9-105 (since revised in light of *Barry Properties v. Fick Bros.,* 277 Md. 15 (1976)), dealing with the *filing* of mechanics liens.

The General Assembly is charged with knowledge of these statutes, and could, of course, have used the word "recorded" in place of "filed" had it cared to do so. We note, for example, that in the very same Act (ch. 241), in § 725, the General Assembly provided that where, upon judicial review of the Secretary's order, the circuit court enters a finding that the

---

9. With the enactment of the Courts article in 1973 as part of the Code Revision process, art. 17, § 1 was repealed and its basic contents reenacted as § 2-201 of the new article. In the revision, however, the distinction noted in the former law between filing and recording was changed, apparently deliberately. Section 2-201 (a) (3) now provides that the clerk shall, when requested in writing "*record* any paper *filed* with his office and required by law to be recorded in the appropriate place, whether or not the title to land is involved." (Emphasis supplied.)

Secretary's rules and regulations are not applicable to the land of the appellant, the Secretary "shall cause a copy of such finding to be *recorded* forthwith in the land records." (Emphasis supplied.) Moreover, at the 1970 session that produced ch. 241, another bill (HB 65), also proposing the regulation of State and private wetlands, was also pending before the General Assembly. In contrast to § 724 as enacted by ch. 241, HB 65 provided that the Secretary's rules and regulations were to be "recorded in the land records." *See,* as well, HB 469 (1969 Session), a predecessor of HB 65. At the very least, the Legislature had before it a clear choice of language, and, in writing § 724, opted for the filing requirement only. As a result, and in the absence of any contraindication, we do not believe that the Legislature intended for Real Property article, § 3-101 to be applicable to the documents mentioned in § 724, and conclude therefore that the trial court erred in holding that it was so applicable.

This still leaves the question of whether there was legally sufficient compliance even with the "filing" requirement of § 724.

Section 724 did not specify who was to file these documents; it said only that they "shall be filed among the land records." This presumes a joint responsibility — one on the Department to present the documents to the clerk in proper form, and, pursuant to former art. 17, § 1, one on the clerk to "file all papers delivered to him to be filed." The trial court apparently credited Mr. Cassell's testimony that he had delivered the maps, order, rules and regulations to the clerk,[10] which was all that the Department was required to do. Its responsibility, in this regard, was met. Unfortunately, however, the clerk did not meet his responsibility. Obviously, neither the order nor the rules and regulations were filed at all; they were

---

**10.** In a footnote, the court stated, with respect to this issue:

"Harold Cassell, Department biologist, confirmed that he delivered the *maps, order, rules and regulations* to the Clerk of the Anne Arundel County Court and that he had received a second request **for them. Garrett Larrimore, Anne Arundel County Clerk,** acknowledged receiving the information 31 August 1973 but the *order, rules and regulations* were misplaced. The maps, however, were in a file cabinet in manila envelopes." (Emphasis supplied.)

misplaced. The maps, it may be said, were "filed", in the narrow sense of the term; but, from the evidence adduced, they were certainly not filed "among the land records", which is what the law required. Secreting the maps away in an area not accessible to the public without some clear public notice calling attention to their existence and availability for inspection does not suffice to comply with the statutory mandate.

What, then, is the effect of this deficiency?

The State, relying primarily upon *Quynn v. Brooke, supra,* 22 Md. 288 (1864), contends that the failure of the clerk to perform his statutory duty does not affect the validity and efficacy of the order and the regulations. Hirsch (and apparently the trial court) contend otherwise, basing their argument on the more recent case of *Plaza Corp. v. Alban,* 219 Md. 570 (1958).

*Quynn* involved the admissibility at trial of what in effect was a deposition — pre-trial testimony given before a commissioner appointed by the circuit court. The objection raised was that the commissioner was not qualified to take the testimony because a certificate attesting to his qualification had not been "recorded among the records" of the county as required by statute (Laws of Md., 1828, ch. 165). The clerk had, in fact, prepared the proper certificate, but he placed it in a "rough bundle of papers" in his office, and never did actually "record" it. The Court of Appeals dismissed the objection upon two bases. First (and the reason for which the case was cited earlier in this Opinion), the Court held that "[t]he filing of the paper in the proper office by the clerk, was a recording of it within the meaning of the Act of Assembly; *so it has been always held with reference to deeds and other papers required by law, to be recorded.*" (Emphasis supplied.) *Id.,* at 294. No authority whatever was cited for this latter statement. Following this, the Court concluded, also at 294,

"But if this were not so, the cases of *Young v. State,* 7 G. & J. 254, and *Boteler v. State,* 8 G. & J. 359, are authorities to show that the omission of the clerk to perform his duty under the Act, in failing to record

the certificate, would not have the effect of impairing the qualification of the Commissioner, who has complied with the law by taking the oath prescribed."

*Quynn v. Brooke* has been cited a few times by the Court of Appeals in subsequent cases, but never for either of those two propositions. Indeed, in *Plaza Corp. v. Alban, supra,* without even mentioning *Quynn,* the Court appeared to reach an opposite conclusion, at least as to the effect of a dereliction by the clerk.

In *Plaza Corp.,* a mortgage covering both realty and chattels had been recorded and noted in the land record index, but the clerk had neglected to note it in the index of chattel records as required by statute. The question was whether, under that circumstance, the mortgage had priority over another mortgage covering some of the same chattels. The Court first concluded (219 Md. at 583) that, under the particular statute, notation of the mortgage in the chattel record index was "an integral part of such instrument's recordation", and that the clerk's failure was therefore not merely one of indexing, but of recording. It then addressed the question of "[w]ho must suffer for the clerk's mistake?"

As to this, the Court observed that there were two points of view. One held that the grantee (*i.e.,* the person in possession of the document) controls the document: "he, alone, has the right and the opportunity to see that it is properly recorded by the registration officer; hence, if he fails to give the notice required by law, he must bear the consequences, and third persons need not go beyond the records to ascertain the title of the property involved." (*Id.,* at 584.) The second theory, which the Court noted emanated from statutes making instruments "operative as records from the time they are *filed for record*" (emphasis supplied) is that "any error occurring after the instrument is filed for record is chargeable to third persons." *Id.,* at 584.

In the context of what was then before it — the requirement that mortgages be recorded to be valid against third parties — the Court affirmed its previous adoption of

the first point of view in *Brydon vs. Campbell and Governeur,* 40 Md. 331 (1874). At page 584, it said:

> "The *American Law of Property . . .* agrees with the *Brydon* case, and points out with force and persuasive reasoning that sound logic implies that a document deposited for record constitutes the record only until the expiration of the time reasonably required by the recording officer to copy it upon his books, and thereafter the record itself is the only evidence upon which a later purchaser is to rely, or which should be considered in deciding whether he had record notice; otherwise a purchaser's only safe course would be to insist upon an opportunity to inspect all of the original instruments in his grantor's chain of title, something that is entirely impractical."

It is apparent to us that neither approach — that of *Quynn v. Brooke* nor that of *Plaza Corp. v. Alban* — is directly applicable to the situation at hand. Not only is the continued viability of the *Quynn* approach open to serious question in light of *Plaza Corp.,* but there is a significant difference between ensuring that adequate public notice is given of restrictions on the use of land and seeing to it that some record is made of the fact that a minor functionary has taken an oath of office. It would involve an enormous, and to us an impermissible, leap to apply the terse statements in *Quynn* as enabling the Court to circumvent the rather clear legislative intent in the Wetlands Law.

*Plaza Corp.,* on the other hand, involved a document whose very validity as to third parties depended upon its being recorded. *See* former Md. Annot. Code (1957), art. 21, § 48, and compare current Real Property article, § 3-101 and §§ 3-201 — 3-203. As the Court noted, were the burden of the Clerk's error in such a situation to fall on innocent third parties, the whole system of recording instruments affecting title to land and chattels would have been thrown into disarray. But that is not the situation here either. Not only is recordation as such not required here, but the statute itself

(§ 724) did not expressly condition the validity of the regulations upon their being properly filed. It merely required that they be so filed.

Fortunately, it is not necessary in this case to pick and choose, by analogy or extension, between these competing doctrines, for there is another consideration that is relevant here.

Although the actual order of the trial court simply dismissed the State's bill of complaint in its entirety, the court's memorandum opinion drew a distinction between the wetlands previously filled (which the court declined to order be restored) and those not yet filled (for which a permit would be needed). Implicit as the basis for this distinction was the element of actual notice.

N.R. § 9-501 (d), as noted, provides for restoration where a person "knowingly violates" the Wetlands Act — any provision of it. It may well be that, because of the clerk's omission to file the various documents among the land records, Hirsch was without constructive (or actual) notice of the designation and the rules and regulations when he purchased the property; and, had he innocently proceeded to conduct his filling operation without notice that wetlands might be involved, his complaint about the clerk's error might well require invocation of the principles applied in *Plaza Corp.*

But the evidence showed (and the court believed) [11] that, before the fill was completed, Hirsch was given actual notice that wetlands might be involved and that a permit or license might be required. The filling was apparently a continuing operation; and, although it is not entirely clear from the record how much of the wetlands had been filled at the various times when contact was had with the State officials, both sides agree that *no* wetlands had been filled prior to Mr. Smith's inspection of the site on August 9, 1974, or, thusly, prior to Mr. Boone's first conversation with Mrs. Hirsch

---

11. The court stated: "Only after they had *begun to fill* the property did they become aware of possible wetlands violations when a Water Resources investigator called Mary Hirsch to warn her of the possible presence of wetlands. When respondents *continued to fill,* the Department filed a complaint on 12 December 1974." (Emphasis supplied.)

shortly thereafter. It is evident, therefore, that *all* of the filling of wetlands occurred *after* Hirsch was apprised — indeed warned — that wetlands might be involved, and it continued even in the face of more precise determinations that wetlands *were* involved. To that extent, his filling operation was not an innocent one; it was "knowing".

The fact that the fill was done in the face of actual notice — notwithstanding that he disagreed with the State's determinations — serves, in our judgment, to remove Hirsch's standing to complain about the lack of constructive notice, either on a statutory or constitutional basis. He offered no evidence of any diminution in the value of his property by reason of the mere existence of wetlands. It is simply a question of his having done what he was warned not to do because he did not concur in the underlying premise that wetlands were involved. When he continued to fill after Mr. Boone's warning, Mr. Hirsch gambled on a court agreeing with his point of view as to whether wetlands were involved and, if so, whether he was subject to the Secretary's regulations. He lost half of that gamble in the circuit court and he will lose the other half here. He may complain about the loss, but not about the risk. That he knew about when he undertook it.

The court erred in dismissing the State's bill of complaint because, upon the factual findings made by the court, the State was entitled to the relief it sought.[12] We shall remand the case to the circuit court for entry of a proper order directing restoration of the wetlands knowingly filled by appellees, pursuant to N.R. § 9-501 (d).

> *Judgment reversed; case remanded to Circuit Court for Anne Arundel · County for further proceedings in accordance with this opinion; appellees to pay the costs.*

---

12. Although the court never reached this issue in light of its other determination, there was substantial evidence admitted to show that the restoration could feasibly be accomplished.