THE UNITED STATES INSURANCE COMPANY,
vs.
SHRIVER, FREEMAN, AND OTHERS.

MARCH TERM, 1851.

[REGISTRY ACTS—MARSHALLING OF SECURITIES—NOTICE TO A DIRECTOR OF A CORPORATION.]

CONVEYANCES of equitable interests in lands, are within the Registry Acts; and the conveyance of such interest first recorded, must be preferred, unless the grantee had actual notice of the prior unregistered deed.

The design of the Registry Acts was, that all rights, incumbrances, or conveyances, touching, connected with, or in any wise concerning land, should appear upon the public records.

The Act of 1831, ch. 205, sec. 3, authorizing bonds of conveyances to be recorded, does not, nor was it intended to, touch *conveyances* of the title, either legal or equitable; its object and effect is simply to authorize the registration of contracts to convey, and not conveyances.

If the subsequent mortgagee, whose deed is registered, had notice at the time of making his contract, of the prior unregistered deed, he shall not avail himself of the priority of his registry, to defeat it.

But such notice must have been received, or chargeable, when the second mortgage was executed; for if a right had vested, when the notice was received, he has then a right to try his speed in attaining a priority of registry.

The registered conveyance will not be postponed, unless the notice is so

clearly proved, as to make it *fraudulent* in the purchaser, to take and register a conveyance in prejudice to the known title of the party holding the first conveyance.

Notice given to a director of an incorporated institution, privately, or which he acquires from rumor, or through channels open to all alike, and which he does not communicate to his associates at the board, will not bind the institution.

But if the notice is given to him officially, for the purpose of being communicated to the board, although such notice should not be so communicated, the institution is bound by it.

If one party has a lien on, or interest in, two funds for a debt, and another party has a lien on, or interest in only one of the funds for another debt, the latter has a right in equity to compel the former to resort to the other fund, in the first instance, for satisfaction, if that course is necessary for the satisfaction of the claims of both parties.

[The facts of this case, are stated in the Chancellor's opinion.]

THE CHANCELLOR:

Although, for the reason stated to the counsel during the argument, I cannot now pass a final decree in this cause, I shall proceed, very briefly, to express my opinion upon some of the questions which have been discussed.

These questions are important, and, perhaps, not free from difficulty; and the conclusions to which, upon a careful consideration of them, I have arrived, have not been formed without considerable doubt and distrust.

The proceedings show, that in March, 1827, Christian Keener, David Keener, and Samuel Keener, purchased of Andrew Shriver, and others, a house and lot, on Market Street, in the City of Baltimore, for the sum of $10,000, for which they took a bond, conditioned for the conveyance thereof on payment of the purchase-money; that they did pay a part, and were put in possession, and subsequently sold the same to William H. Freeman, who took possession, and paid his vendors, the Keeners, on account thereof, the sum of $7,000, being the amount which they, the Keeners, had paid the Shrivers; the balance of the purchase-money, due the latter from the Keeners, being, by agreement, to be paid by Freeman.

In this state of things, Freeman, being indebted to the Gene-

ral Insurance Company in the sum of $15,000, executed to that Company a mortgage of this property, on the 16th of January, 1834, which was duly acknowledged and recorded among the land records of Baltimore County, on the 2d of April following; and on the 29th of March, of the same year, he executed to the United States Insurance Company, to secure the payment of the sum of $80,000, a mortgage of this, with sundry other parcels of property, which last-mentioned mortgage was, also, duly acknowledged and recorded, on the day of its date; and the question is, which of these two mortgages is entitled to priority?

It is maintained, *first*, on the part of the General Insurance Company, that inasmuch as Freeman, the mortgagor, had but an equitable interest in the premises, there was no necessity at all for the registration of the deed, and that, consequently, the United States Insurance Company are not entitled to be preferred, because their deed was placed first upon the records. In other words, the position is, that conveyances of equitable interests in lands, are not within the Registry Acts. If they are, then, according to the express terms of the first section of the Act of 1825, ch. 203, the deed first recorded must be preferred; unless, indeed, it can be shown, that when that deed was taken, the grantee had actual notice of the unregistered conveyance.

This question, with reference to the necessity of recording conveyances from parties holding equitable estates, arose in the case of the *Ohio Life Insurance and Trust Company* vs. *Winn and Ross*, 2 *Md. Ch. Decisions*, 25; and although it does not distinctly appear that it was made a point in the argument at the bar, it was expressly decided by the Court, and upon subsequent reflection, I am persuaded was correctly decided. It appears to me to be quite clear, that conveyances of such titles to real estate are within the wise and salutary policy of our Registration Acts; and that one of the great ends of those Acts, as declared in the preamble to that of 1766, ch. 14, would be defeated, and creditors and purchasers exposed to many of the hazards, which it was the design of the legisla-

ture to protect them from, if they are to receive the narrow construction contended for. There is nothing, as I conceive, in the language of the Acts, which restricts them to conveyances of the legal estate; and, in the words of the eminent Judge who delivered the opinion of the Court of Appeals, in *Hays* vs. *Richardson*, 1 *Gill & Johns.*, 384, "their design was that all rights, incumbrances, or conveyances touching, connected with, or in anywise concerning land, should appear upon the public records."

It would, indeed, be strange, and as much to be regretted as strange, that an absolute deed from a party holding under a bond of conveyance, and who had paid the whole purchase-money, need not go upon the record for the information of creditors and purchasers, and yet a deed for any estate above seven years must be registered to be effectual. In the one case the whole beneficial interest would pass without registration, and consequently without notice to the public, whilst in the other, because the grantor happened to be clothed with the legal estate, if he attempts to convey an interest for any time more than seven years, his purpose will be frustrated, unless the deed is acknowledged and recorded as required by the statute.

I do not think that the argument which has been made, to prove that deeds or mortgages made by parties holding under bonds of conveyance are not within our Registry Acts, derives any strength from the Act of 1831, ch. 205, the 3d section of which authorizes bonds of conveyance or contracts to be recorded, and makes copies from the record evidence. That Act does not touch, nor was it intended to touch, *conveyances* of the title, either legal or equitable, and its object and effect is to authorize the registration of contracts to convey, and not conveyances, and therefore the right or the authority to record the latter, whether of the legal or equitable title, must depend upon the state of the law as it stood before. It is, therefore, as it seems to me, no argument against the right to enrol a conveyance of an equitable title, to say that there was no law which authorized the enrolment of the bond of conveyance

from Shriver to the Keeners, of 1827. So far as relates to the parties to the conveyance, the contract is complete; not so with reference to the bond or contract to convey, which gives no more than a right to compel a conveyance upon performance by the obligee, or the party contracted with, of his part of the contract.

I conclude, therefore, without further reasoning upon the subject, that the Registry Acts do embrace the mortgages of the 16th of January and 29th of March, 1834, and that the preference is to be given to that which was first recorded, unless the mortgagee, at the time it was taken, had notice of the prior deed. It is a settled rule, says Chancellor Kent, in the 4th volume of his Commentaries, 169, "that if a subsequent purchaser or mortgagee, whose deed is registered, had notice at the time of making his contract of the prior unregistered deed, he shall not avail himself of the priority of his registry to defeat it, and the prior unregistered deed is the same to him as if it had been registered." The notice, however, must have been received or chargeable when the second mortgage was executed, for if a right had vested when the notice of the prior unregistered incumbrance was received, "the mortgagee has then a right to try his speed in attaining a priority of registry." *Ibid.*, 172.

The question then is, whether the United States Insurance Company, when they took the mortgage of the 27th of March, 1834, had notice in fact of the existence of the prior incumbrance of the preceding January to the General Insurance Company, for if they had, then, as to them, it is the same as if it had been registered.

This doctrine of postponing registered to unregistered conveyances, upon the ground of notice, has sometimes been regretted by the Courts, and it is subject to the qualification that it shall prevail only in cases where the notice is so clearly proved, as to make it fraudulent in the purchaser to take and register a conveyance in prejudice to the known title of the other party holding the first conveyance; *Wyatt* vs. *Barwell*, 19 *Ves.*, 439. It is, says Sir William Grant, in that case,

" only by actual notice, clearly proved, that a registered con-
veyance can be postponed."

I have read the evidence in this case with great attention,
and do not think it furnishes that clear and convincing proof
which the rule requires.    Suspicion of notice is not sufficient.
The inference of a fraudulent intent affecting the conscience,
must be founded on strong and pregnant circumstances, in the
absence of actual notice; 4 *Kent*, 172.    There is, unquestion-
ably, some confusion in the evidence of Mr. Freeman upon
this question of notice; and when it is remembered that in the
list of his property, which has been produced and proved to
be in his own handwriting, this Market Street property is put
down at $16,000, the inference is very strong, that no notice
was taken of the lien of the General Insurance Company,
because, as he himself says, in his answer to the 11th cross-
interrogatory, the lien of that Company covered the entire
interest of the witness in the property.    It is said there was
another list, and I take it for granted there was; but Mr.
Freeman says, in answer to the 12th cross-interrogatory, that
he does not know whether said lien was on the list or not,
" nor has he any belief on the subject, except as a matter of
inference."    That Mr. Freeman furnished the list in which
this piece of property is estimated at $16,000, which was the
full value of his interest in it, throwing out of view altogether
the lien of the General Insurance Company, as the basis of
his application to the United States Insurance Company for a
loan, there is, I think, no reasonable ground to doubt.    Mr.
Atkinson, the Secretary of the United States Insurance Com-
pany, says that he found the list among the papers of the
Company, and that it corresponds with the entry in the day-
book; and that upon a careful search among their papers, he
has not been able to find any other list.    Now, if Mr. Free-
man did not intend that this piece of property should be taken
as a valuable security, why did he put it in the list at all?
According to his answer to the 11th cross-interrogatory, the
lien of the General Insurance Company was equal to the full
amount of his interest in the property.    Why, then, did he

include it in the list? If the United States Insurance Company knew of the prior mortgage, they also knew that this property thus encumbered was no security whatever. If they did not know of its existence, they were deceived with regard to it.

In the absence, then, of any other list, and without any proof that the lien in question was noted upon such other list (for Mr. Freeman expressly says he does not know whether said lien was on it or not), and seeing that the list which has been produced was preserved by the United States Insurance Company, and furnished the basis of an entry in its books, there would seem to be very little doubt that it was regarded by the Company as a substantial and not a mere nominal security, which it would have been considered, if known to be encumbered by a previous mortgage to the full value of the interest of the mortgagor in it.

The ground taken in this case is, that Peter Neff, the President of the United States Insurance Company knew of the lien held by the General Insurance Company, and this knowledge, it is insisted, is binding on the corporation of which he was the President. But there is no proof bringing home to Mr. Neff specific knowledge of this lien. It rests entirely upon inferences drawn by Mr. Freeman from the fact, as appears by his answer to the 4th interrogatory in chief, that Neff had full knowledge of all his real property, and transactions concerning the same. He says expressly that he cannot say whether Neff had *specific knowledge* of the lien of the General Insurance Company, and by his answer to the 8th cross-interrogatory, it appears that the witness, Freeman, was largely engaged in business transactions, buying and selling, and that his property and his interest therein was continually and almost daily changing. Now, under these circumstances, and in view of the rapid and constant mutations which property in the hands of this gentlemen was liable to, when its condition one day furnished no ground for assuming what its situation might be the day after, it would seem improper, merely because an individual happened to be familiar with his

affairs, to charge that individual with knowing, at a particular point of time, the precise condition of a specific portion of his property, especially when the imputation of such knowledge involves the guilt and consequences of fraud.

But assuming, for the sake of the argument, that Mr. Neff did know of this lien, the question still remains, whether his knowledge is the knowledge of the corporation, and binding upon it ?

There is not a particle of testimony that the mortgagor, Freeman, communicated the information to Neff in his official capacity and for the purpose of being disclosed to the directors of the Company of which he was the president.   If Neff had knowledge of the lien at all, it was acquired in a general way, in conversations with Freeman about his affairs, and certainly with no direct view to this particular transaction, or for the purpose of being communicated to the Company over which he presided.   This is most manifest from the whole scope and tenor of the evidence, and hence the legal question arises, whether knowledge picked up in this way by a director of a corporation in his private and not in his official capacity, with no view to the transaction in question, shall so far affect the corporation with notice as to invalidate that transaction upon the ground of fraud ?

It appears to me that the sound and safe rule on the subject is this, that notice given to a director of an incorporated institution privately, or which he acquires from rumor, or through channels open to all alike, and which he does not communicate to his associates at the Board, will not bind the institution.   But that if the notice is given to him officially, for the purpose of being communicated to the Board, although such notice should not be so communicated, the institution is bound by it.

This appears to me to be the reasonable doctrine, and to be maintained by the weight of authority, though, as remarked by *Mr. Justice Story*, in his treatise *on Agency*, it is not very easy to affirm what is the prevailing rule, since the authorities are not entirely agreed.   *Story on Agency, sec.* 140 (*a*).   The

cases which make a distinction between notice to a director who acts at the Board in the particular transaction, and notice to a director who does not so act, and which affirm that the corporation is bound in the former case and not in the latter, are evidently disapproved of by the learned author, who is of opinion that if either of these distinctions is to prevail, the foundation on which the security of all moneyed or other corporations rests will be sapped, it being clearly his opinion, that no act, or representation, or knowledge of any agent of such corporation, should bind it, unless officially done, made, or acquired. *Ibid.*, sec. 140 (*b*). And in this opinion, as I conceive, he is supported by the current of authority. *National Bank* vs. *Norton*, 1 *Hill's N. Y. Rep.*, 575, 578; *Sharon Canal Co.* vs. *Fulton Bank*, 4 *Paige*, 127, 129; *Washington Bank* vs. *Lewis*, 22 *Pick.*, 24.

The cases of the *Bank of the United States* vs. *Davis*, 2 *Hill's N. Y. Rep.*, 451, and of the *North River Bank* vs. *Aymar*, 3 *Ibid.*, 262, do seem to recognise the distinction, and to prove that if any one of the directors who participates with the Board in the particular transaction has notice, it is sufficient to bind the corporation, although the other directors have no knowledge thereof. But, as before said, this distinction is condemned by Mr. Justice Story, who reviews all the authorities upon the subject, and appears to me replete with mischief and insecurity to all corporations. In commenting upon the cases, the author, at section 140 (*c*), speaks of the identical case now under consideration, and inquires, in a mode clearly showing his disapprobation of the doctrine, that notice to a director who acts in the transaction will bind the corporation, "whether a mortgage made to a bank by one of its directors, or by a third person, would be affected by a prior unregistered incumbrance or other equities attaching to it, which were known at the time to such director?" And there would seem to be no doubt, from the way in which the question is put, and the whole tenor and drift of the commentaries of the writer, that he was of opinion that the bank would not be affected by such notice.

Upon the whole, then, I conclude, that even conceding Mr. Neff, as an individual, from his general knowledge of the affairs of the mortgagor, had known of, or had reason to believe in, the existence of the mortgage to the General Insurance Company, yet as that information was not communicated to him officially, for the purpose of being communicated to the Board, and as, looking at the value at which the property was estimated, there is no reason to believe the Board knew of such mortgage, there is no foundation, either in principle or upon authority, so to affect them with notice, as to subject them to the imputation and consequences of fraud, and that, consequently, the mortgage to the United States Insurance Company being the first registered, must be preferred.

I entirely concur with the Judges who have doubted the propriety of breaking in upon the policy of the Registry Acts, and shall refrain from doing so to a greater extent than required by the authorities. The cases go upon the ground of fraud in taking a deed or mortgage, and having it recorded, when the party knows of the existence of a prior deed or mortgage which has not been recorded; but as fraud is not to be imputed upon slight grounds, the party who charges it against his adversary is required upon every principle to make it out by clear and satisfactory proofs.

Some stress was laid in the argument upon a report, which Mr. Freeman says was made by a committee of the Board of Directors of the United States Insurance Company, when he applied for the loan. But he expressly says, he does not know whether Mr. Neff communicated to that committee his knowledge of the lien of the General Insurance Company on the property in controversy. He states, however, that it was down on the list at a valuation of $16,000, but what valuation the committee put upon this particular piece of property, for the purpose of the mortgage, he does not know. They took the whole property, he says, at a valuation of $137,000, free of ground-rents, as a security for two mortgages, a previous transaction of $29,000 and that for $80,000, now in controversy.

Now the property contained in the list proved to be in the handwriting of Mr. Freeman, which has been spoken of before, marked complainant's Exhibit, No. 3, and which Atkinson says he found among the papers of the Company, is put down at the aggregate value of $137,410, free of ground-rents; and in this list, this particular piece of property is valued at $16,000. And in complainant's Exhibit No. 1, which is copied from the day-book of the United States Insurance Company, and from which is excluded some items contained in the list furnished by Freeman, this same property is likewise valued at $16,000. Now in the absence of any other list or valuation, I think it may very fairly be inferred that this list, marked Exhibit No. 1, is a copy of that which was made by the committee, and that they assumed the property in question to be worth $16,000, at which Mr. Freeman put it down in his list, and which he says was the entire value of his interest in it, making no deduction for the lien of the General Insurance Company, of $15,000.    Mr. Freeman says the committee made a full report, which he has seen in the book of the minutes of the daily proceedings of the Board, and that the books were kept with great regularity and fulness.    And Mr. Atkinson says he has made a careful search among the books and papers of the Company, and has not been able to find any other list of the property, than the Exhibits No. 3, in the handwriting of Freeman, and the entry of which Exhibit No. 1, is a copy.

Under all these circumstances, there is certainly no reason to believe that there is any other list, or that the Committee appointed by the Board knew of the existence of the lien of the General Insurance Company.    If they had known of it, it is difficult to imagine a reason for not noticing it.

Something was said in the course of the argument at the bar, upon the subject of marshalling of the securities, and it may at some future stage of the cause become necessary and proper to apply that doctrine to this case.    The general principle is a familiar one, that if one party has a lien on or interest in two funds for a debt, and another party has a lien on or interest in only one of the funds for another debt, the latter

has a right in equity to compel the former to resort to the other fund in the first instance for satisfaction; if that course is necessary for the satisfaction of the claims of both parties. *Aldrich* vs. *Cooper*, 8 *Ves.*, 388, 395, 396; *Ex parte Kendall*, 17 *Ves.*, 520; *Cheesbrough* vs. *Millard*, 1 *Johns. Ch. Rep.*, 413.

I do not, however, propose at this time to go into any inquiry as to the applicability of the doctrine to this case, nor do I think it necessary to examine into or to express any opinion in regard to the consideration of the mortgage to the United States Insurance Company. All I mean to decide is, that assuming the consideration to be a valuable and fair one, that mortgage is to be preferred to the mortgage to the General Insurance Company.

———

CONSTABLE and FARNANDIS, for the United States Insurance Company.

PRATT and WALLIS, for the General Insurance Company.