JOHN J. HIRSCH ET AL. *v.* MARYLAND DEPARTMENT
OF NATURAL RESOURCES, WATER
RESOURCES ADMINISTRATION

[No. 59, September Term, 1979.]

*Decided June 24, 1980.*

Motion for reconsideration and clarification and stay of Mandate filed July 24, 1980; denied August 11, 1980.

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, *ORTH, COLE and DAVIDSON, JJ.

*John J. Hirsch* for appellants.

*Richard E. Rice, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Thomas A. Deming, Assistant Attorney General,* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

By Chapter 241 of the Acts of 1970, presently codified as Maryland Code (1974), § 9-101 *et seq.* of the Natural Resources Article,[1] the General Assembly enacted the Wetlands Act of 1970, which substantially changed the statutory and common law privileges and responsibilities of owners of real property contiguous to bodies of tidal water in this state. Finding that the despoliation or destruction of

---

* *Reporter's Note*: Orth, J., participated in the hearing of the case and in the conference in regard to its decision but retired prior to the adoption of the opinion by the Court.

1. Before the enactment in 1974 of the Natural Resources Article, Chapter 241 was codified as Maryland Code (1957, 1970 Repl. Vol.), Art. 66C, § 718 *et seq.* Although some of the activities pertinent to this case occurred prior to the enactment of the 1974 Code, any differences in language between former Art. 66C and the present Natural Resources Article are not relevant to our resolution of this case. Therefore, we shall in this opinion refer only to the present Natural Resources Article.

wetland areas by certain unregulated activities had adversely affected important ecological, economic, recreational and aesthetic interests (§ 9-102), the Legislature established a comprehensive plan providing for the restriction and regulation of various activities affecting wetlands in order to preserve and protect them. The Wetlands Act directed the Secretary of Natural Resources to determine the landward boundaries of any wetlands and to promulgate rules and regulations governing certain activities which might alter or affect any wetlands located on private property. The petitioners in this case, John, William and Robert Hirsch and their respective wives Mary, Elizabeth and Glenda Hirsch (all of whom shall hereafter collectively be referred to as Hirsch), owned five waterfront lots in Anne Arundel County. After commencing to place fill dirt on these lots, Hirsch was told by agents of the Department of Natural Resources that the fill may have been placed in wetland areas in violation of the Wetlands Act of 1970 and certain rules and regulations adopted by the Secretary. The principal issue in this case is whether these purported rules and regulations adopted by the Secretary are invalid because of the Secretary's alleged failure to comply with the Act's provisions governing their promulgation.

Before dealing with the facts and issue of this case, a brief summary of the Wetlands Act of 1970, and some of the changes which it made in the pre-existing law, may be helpful.[2] Under common law principles, title to the bed of navigable waters, defined as the land beneath the mean high tide mark of these waters, rests in the state for the benefit

---

2. For a comprehensive history of the development of various aspects of the law relating to state and private ownership of the lands bordering on or lying under bodies of water, see Harbor Island Marina v. Calvert Co., 286 Md. 303, 314-319, 407 A.2d 738 (1979); Potomac Sand & Gravel v. Governor, 266 Md. 358, 364-366, 293 A.2d 241, cert. denied, 409 U.S. 1040, 93 S. Ct. 525, 34 L. Ed. 2d 490 (1972); Bd. of Pub. Works v. Larmar Corp., 262 Md. 24, 277 A.2d 427 (1971); Van Ruymbeke v. Patapsco Ind. Park, 261 Md. 470, 276 A.2d 61 (1971); Kerpelman v. Bd. of Public Works, 261 Md. 436, 445, 276 A.2d 56, cert. denied, 404 U.S. 858, 92 S. Ct. 109, 30 L. Ed. 2d 100 (1971); 50 Opinions of the Attorney General 452 (1965); Power, Chesapeake Bay in Legal Perspective, U.S. Dept. of Interior, Estuarine Pollution Study (1970); Salsbury, Maryland's Wetlands: The Legal Quagmire, 30 Md. L. Rev. 240 (1970).

of its citizens, by virtue of the state's succession to the rights and title of the Lord Proprietor who had received the land by grant from the Crown of England, unless title to the land beneath such waters had been expressly granted to a private person. *See Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 314, 407 A.2d 738 (1979); *Bd. of Pub. Works v. Larmar Corp.,* 262 Md. 24, 35, 277 A.2d 427 (1971); *Van Ruymbeke v. Patapsco Ind. Park,* 261 Md. 470, 475-476, 276 A.2d 61 (1971); *Browne, et al. v. Kennedy,* 5 H. & J. 195 (1821); Maryland Declaration of Rights, Art. 5; 50 *Opinions of the Attorney General* 452, 454 (1965). Navigable water has traditionally been defined in Maryland as water subject to the ebb and flow of the tide. *Van Ruymbeke v. Patapsco Ind. Park, supra,* 261 Md. at 475.[3]

Correspondingly, absent an express grant of the title to the land beneath navigable water, an owner of land bordering on navigable water was deemed to own the land only to the mean high tide mark. *Id.* at 475. In addition, the owner of land bordering navigable water was accorded certain other rights by statutory and case law. Thus, he was entitled to any gain or increase in his land that was naturally caused, such as by the recession of the adjacent water or by the depositing of soil on his land by tidal action. Moreover, he was also permitted to use the adjacent waters for artificial improvements to his property, such as by building wharves, bulkheads, piers, or under some circumstances placing fill in the waters, as long as the improvements did not interfere with the public's rights of navigation and fishing. *See Harbor Island Marina v. Calvert Co., supra,* 286 Md. at 315-318; *Bd. of Pub. Works v. Larmar Corp., supra,* 262 Md. at 36-44; Code (1957, 1968 Repl. Vol.), Art. 54, §§ 45-46, which was replaced by the Wetlands Act of 1970.

---

3. *See,* however, Owen v. Hubbard, 260 Md. 146, 152, 271 A.2d 672 (1970); Green, Tr. v. Eldridge, 230 Md. 441, 446, 187 A.2d 674 (1963); Wagner v. City of Baltimore, 210 Md. 615, 624-625, 124 A.2d 815 (1956), discussing certain of our cases which had applied both the traditional Maryland test as well as the federal test of being "navigable in fact," and found that, in many of the cases, the result would not have been altered if either test had been exclusively used.

The Wetlands Act of 1970 modified these relationships between the state and the landowner with respect to the activities permitted on certain types of land and its adjacent waters. Stating that the dredging, filling and other similar activities had despoiled or destroyed some of the wetlands in this State, and that these activities threatened the existence of the remaining wetlands, the Act declares that it is the "public policy of the state . . . to preserve the wetlands and prevent their despoliation and destruction." Code (1974), § 9-102 of the Natural Resources Article.[4] Therefore, the Act provides a comprehensive plan for regulating the dredging and filling of the state-owned land beneath navigable waters, and, for the first time, the Act undertakes to regulate activities affecting privately owned wetlands.

The Wetlands Act establishes a bipartite scheme depending on whether the wetlands are state or private. "State wetlands" are defined as

> "any land under the *navigable waters of the state below the mean high tide, affected by the regular rise and fall of the tide.* Wetlands of this category which have been transferred by the state by valid grant, lease, patent or grant confirmed by Article 5 of the Declaration of Rights of the Constitution shall be considered 'private wetland' to the extent of the interest transferred." (§ 9-101 (m), emphasis supplied.)

With respect to these wetlands, the Act broadly states: "[a] person may not dredge or fill on state wetlands, without a license." § 9-202 (a). The Act describes the procedures for obtaining a license from the Board of Public Works and for judicial review of the Board's decision (§§ 9-201 — 9-203).

The regulatory plan for private wetlands is more elaborate, containing many conditions with regard to the

---

**4.** Hereinafter, all references to the Maryland Code will be to the Natural Resources Article unless express reference is made to other articles of the Code.

prohibitions set forth and the actions of the state officials involved. Private wetlands are defined as

> "any land not considered 'state wetland' *bordering on or lying beneath tidal waters, which is subject to regular or periodic tidal action and supports aquatic growth.* This includes wetlands, transferred by the state by a valid grant, lease, patent, or grant confirmed by Article 5 of the Declaration of Rights of the Constitution, to the extent of the interest transferred." (§ 9-101 (j), emphasis supplied.)

Section 9-101 (k) defines "regular or periodic tidal action" as "the rise and fall of the sea produced by the attraction of the sun and moon uninfluenced by wind or any other circumstance." Thus, as one commentator has observed, a private wetland does not have to be under the navigable water of the state or below mean high tide; instead, it may be located above mean high tide, and, therefore, on private land, as long as it borders on tidal water, is subject to some tidal action, and supports aquatic growth. Salsbury, *Maryland's Wetlands: The Legal Quagmire,* 30 Md. L. Rev. 240, 252 (1970).

The Act assigns the regulation of private wetlands to the Department of Natural Resources rather than to the Board of Public Works. By § 9-301 (a), the Secretary of Natural Resources is directed to inventory and delineate the location of the landward boundaries of all wetlands and to prepare maps showing the boundaries. The Secretary is also directed to promulgate "rules and regulations governing dredging, filling, removing, or otherwise altering or polluting private wetlands. The rules and regulations may vary as to specific tracts of wetlands, because of the character of the wetlands." § 9-302 (a).

After completing the wetland boundary maps and formulating the proposed rules and regulations governing private wetlands in a county, the Secretary is instructed to hold a public hearing in that county. He is further required to give notice of this hearing not only by publishing a notice in a newspaper generally circulated in the county, but also

by mailing a copy of the notice and a copy of the proposed private wetlands rules and regulations to *each* owner, as shown on the tax records, of land designated on the map(s) as a wetland (§ 9-301 (b)). After directing the Secretary to consider any testimony or other facts presented at the hearing, "the rights of every affected property owner, and the purposes" of the Act, the statute provides that

> "the Secretary *shall* establish by *order* the landward bounds of *each* wetland and the rules and regulations applicable to it. A copy of the *order,* together with a *copy of the map* depicting the boundary lines, *shall be filed among the land records in every county* affected after final appeal has been completed. The Secretary shall give notice of the order to each owner of record of any land designated as wetlands by mailing a copy of the order to the owner by registered or certified mail. . . ." (§ 9-301 (c), emphasis supplied.)

Section 9-304 permits any person with a recorded interest in land affected by the private wetlands regulations to seek further administrative review of the rules and regulations and the designation of his land(s) as wetland(s). If dissatisfied with this decision, that person may seek judicial review to determine whether the rules and regulations are so restrictive as to deprive him of so much of the practical use of the land that it is an "unreasonable exercise of the police power so as to constitute a taking of property without compensation." § 9-305 (a).

Section 9-306 (a) provides that any person intending to conduct on any wetland activity not permitted by the private wetlands regulations must apply to the Secretary of Natural Resources for a permit to conduct such activity. In deciding whether to grant the permit, the Secretary is directed to consider, among other things, ecological factors, the public health and welfare, and the public policy of the Act (§ 9-306 (b)). Provisions for administrative and judicial review of the decision to grant or deny the permit are set forth in §§ 9-307 and 9-308.

Section 9-501 (a)-(c) states that the violation of the Act or of any private wetland "regulation adopted by ... the Department pursuant to the provisions" of the Act is a misdemeanor punishable by fine or imprisonment. In addition, § 9-501 (d) provides that a person who knowingly violates any provision of the Act "is liable to the state for restoration of the affected wetland to its condition prior to the violation if possible." [5]

---

**5.** As set forth in the Natural Resources Article, § 9-501, as amended, provides in pertinent part:

"§ 9-501. Enumeration.

(a) *First offense.* — Any person who violates any provision of this title is guilty of a misdemeanor. Unless another penalty is specifically provided elsewhere in this title, the person, upon conviction, is subject to a fine not exceeding $500, or imprisonment not exceeding three months, or both, with costs imposed in the discretion of the court.

(b) *Second or subsequent offense.* — Any person found guilty of a second or subsequent violation of any provision of this title ... is subject to a fine not exceeding $1,000, or imprisonment not exceeding one year, or both . . . .

(c) *Violation of rule or regulation.* — In addition to any administrative penalty provided in this title, violation of any rule or regulation adopted by any unit within the Department pursuant to the provisions of this title is a misdemeanor and is punishable as provided in subsections (a) and (b) of this section.

(d) *Additional penalty.* — Any person who knowingly violates any provision of this title is liable to the state for restoration of the affected wetland to its condition prior to the violation if possible. The court shall specify a reasonable time for completion of the restoration."

With respect to the criminal penalties, subsections (a) and (b) impose a fine or imprisonment, or both, for a violation of "any provision of this title." Subsection (c) also imposes these criminal penalties for a "violation of any rule or regulation adopted ... pursuant to the provisions of this title." With respect to the additional penalty requiring restoration of a wetland, however, subsection (d) provides for this penalty only for a violation of "any provision of this title," and there is no subsection, equivalent to subsection (c), which provides for the imposition of this additional penalty for a knowing violation of any of the applicable rules and regulations.

We note, however, that as originally enacted in Ch. 241 of the Acts of 1970, and as set forth in Code (1957, 1970 Repl. Vol.), Art. 66C, § 730, the Act provided for restoration upon a knowing violation of either the "rules and regulations or any provision of this subheading." Although a provision imposing restoration for a violation of the rules and regulations was not included in § 9-501 when the Natural Resources Article was enacted, the Revisor's Note does not contain any indication that a substantive change was intended. In any event, because no issue has been presented in this case as to whether restoration liability may be imposed for a knowing violation of only rules and regulations, we need not address the matter at this time.

Finally, § 9-310 authorizes a court to "restrain any violation" of the Act in an action brought by the Department.

We turn now to the facts of the instant case. The five waterfront lots that are involved in this litigation border on Cornfield Creek, a tributary of the Magothy River, in Anne Arundel County. The chain of title to these lots is traceable to an 1814 patent from the State of Maryland to Vachel Phillips. When the Wetlands Act was enacted in 1970, these lots were owned by the Emerson Development Company. In September 1972, Emerson conveyed the lots to Ann Szymanski. The deed, however, was not recorded in the land records until October 31, 1972.

Pursuant to the directions in §§ 9-301 (a) and 9-302 (a), the Department of Natural Resources began to inventory and prepare maps defining the boundaries of wetland areas and to formulate the proposed private wetlands regulations. This task was completed in 1972. As required by § 9-301 (b), the Department mailed, on October 25, 1972, a copy of the proposed private wetlands regulations and the individual notices of the hearing concerning the designation of wetland areas to the owners, as shown by the tax records, of property located in Anne Arundel County that had been designated on the proposed map(s) as wetlands. Also as required by § 9-301 (b), the Department published notices of the hearing in several newspapers generally circulated in Anne Arundel County. The five lots at issue here were tentatively designated as containing private wetlands. Because the deed conveying these five lots from the Emerson Development Company to Ann Szymanski was not recorded until October 31, 1972, however, Emerson, and not Mrs. Szymanski, was listed as owner of the lots on the tax records. Consequently, the Department sent the notice to the address listed in the tax records for Emerson's resident agent. Because the resident agent had moved from that address four years earlier, neither he nor Emerson appear to have ever received the notice.

After the hearing was held, the Secretary, on January 25, 1973, signed the final order establishing the boundaries of

each private wetland in Anne Arundel County and adopting the applicable private wetlands regulations. Attempting to comply with the directions in § 9-301 (c), in September 1973 the Department purported to mail the individual notice of the order to each owner of record of land designated as a wetland. Although this mailing occurred approximately ten months after the notices of the proposed hearing had been mailed, and nearly eight months after the Secretary had signed the final order, the Department did not re-examine the tax records for any intervening changes in ownership but, instead, relied on the same list of owners that had been prepared ten months earlier for the mailing of the hearing notices. Although Mrs. Szymanski was by this time listed as the owner of record of the five lots, the notice of the final order was nevertheless again sent to Emerson at the address from which its resident agent had moved. There is some evidence that the resident agent's secretary may somehow have received this notice, but it is clear that the agent did not notify Mrs. Szymanski. Therefore, she failed to receive the notice that the lots had finally been designated as private wetlands and were subject to the applicable regulations.

In addition, § 9-301 (c) requires that a copy of the order and the maps delineating the boundary lines of wetlands areas "shall be filed among the land records in every county affected." A representative of the Department testified that, in August 1973, he delivered a copy of the Secretary's order establishing the wetlands boundaries for Anne Arundel County, the wetlands maps for the county, and the private wetlands rules and regulations, to the Clerk of the Circuit Court for Anne Arundel County. It is undisputed, however, that neither the order nor the maps nor the rules and regulations were ever filed or referred to in the land records. Instead, the maps were placed in a file cabinet drawer in an area inaccessible to the public or to title searchers. Whether the copies of the order or of the private wetlands regulations were also placed in the file cabinet is unclear, but these documents were eventually misplaced or lost. It appears that it was not until May 1975 that the order, the rules and

regulations, and an index to the wetlands maps, were placed on a wall in the clerk's office in such a manner that they might come to the attention of the public or a title searcher. However, it was not until at least February 1977 that a list was ever posted of the names of each owner of property determined by the Secretary's order to contain wetlands.

The petitioners in this case, the Hirsches, purchased the five lots on Cornfield Creek from Mrs. Szymanski in July 1974. Prior to that time, Hirsch engaged Mrs. Nelker, a professional title searcher, to perform a title search on the lots. She reported that the title was free of any cloud. She did not tell Mr. Hirsch that the lots had been designated as wetlands. Moreover, she testified that there was no way that she could possibly have learned of this fact by a title search. In late July or early August, Hirsch began clearing debris and trees from the lots. On August 9, 1974, Mrs. Hirsch received a telephone call from a Mr. Boone of the Department of Natural Resources. Mrs. Hirsch testified that Boone never mentioned the subject of wetlands. Mr. Boone, however, testified that he had advised Mrs. Hirsch that her property had been inspected by the Department in response to a complaint, and that, although the Wetlands Act had not been violated at that time, a wetlands license or permit should be applied for if they intended to fill or clear debris beyond that which had already occurred.

Thereafter, Hirsch began to place fill dirt on the property. Responding to another telephone complaint, inspectors for the Department revisited the property in late November and early December 1974, and determined that fill had been placed on private wetlands without a permit, in violation of the applicable private wetlands rules and regulations.[6]

---

6. Section IV A of the private wetlands regulations for Anne Arundel County adopted by the Secretary provides:

"Except where otherwise authorized in Section III above or subsequent to a permit issued pursuant to Section VI herein:

A. No person shall fill, place, dump or discharge on the wetlands encompassed in this Order any loam, peat, sand, gravel, soil, or other similar substance; or any trash, garbage, debris, junk, or other polluting substance."

Subsequently, an administrative order was issued on December 12, 1974, by the Water Resources Administration of the Department of Natural Resources, ordering Hirsch to discontinue any filling activities on the property and to submit a plan for the restoration of the property to its previous condition. At Hirsch's request, an informal administrative hearing relating to the order was held. Afterwards, the Department again concluded that a violation had occurred and ordered Hirsch to submit a plan for restoration of the wetlands.

After Hirsch did not comply, the Department instituted the present action in the Circuit Court for Anne Arundel County by filing a bill of complaint for a mandatory injunction requiring Hirsch to restore the wetlands. The bill alleged that Hirsch had knowingly filled both state and private wetlands without a license or permit. Hirsch denied both that any wetlands had been filled and, if they had been filled, that it was done knowingly. In addition, Hirsch argued that the Department's private wetlands rules and regulations, purporting to regulate the filling of private wetlands, were invalid because the Department had failed to comply with the statutory procedure for promulgating the regulations. According to Hirsch, the Department failed to comply with § 9-301 (c)'s requirements that copies of the final order, establishing the actual boundaries of wetlands, and maps "depicting" those boundaries be "filed among the land records" and that notice of the final order be mailed to each owner of record of affected land. With respect to the latter contention, Hirsch pointed out that the notice had been sent to the Emerson Development Company even though Mrs. Szymanski was at that time listed as the owner of record. Finally, Hirsch argued that the State's grant of land, including the lots at issue here, to Vachel Phillips by the 1814 patent had included some of the land under the waters of Cornfield Creek. Because the definition of state wetlands in § 9-101 (m) excludes wetlands under navigable water which have been transferred by the State, Hirsch contended that any wetlands that were filled could only be private wetlands.

At trial, in order to prove that both state and private wetlands had been filled, the State presented numerous expert witnesses describing certain types of vegetation growing on the lots, of a type characteristically found in tidal wetlands. The State also presented tidal data designed to establish that the property was in a tidal area and test results analyzing the marshland content of soil borings from filled areas of the property. In a written memorandum and order, the trial court found as a fact that the Hirsch property had contained wetlands prior to fill and that fill had been placed over some of these wetlands. The court also found, however, that the State had failed to meet its burden of proof that state wetlands had been filled. According to the court, the State's evidence had only showed the topography of the land and the tidal levels as they were in 1976, when the tests had been made, but had failed to show the topographical or tidal conditions as they existed in 1974 when the filling took place. Thus, the court found that the filled lands were private wetlands.[7] Finally the court agreed with Hirsch that the private wetlands rules and regulations were invalid. The court pointed out that § 9-301 (c) required that the wetlands maps and the order must be filed among the land records. According to the court, the Wetlands Act and the private wetlands regulations created, in effect, a restrictive covenant applicable to the property. Therefore, the court concluded that the order designating the property as wetlands, the maps, and the private wetlands regulations, were within the scope of Code (1974), § 3-101 (a) of the Real Property Article, which requires that no "declaration or limitation of use . . . or deed may pass or take effect unless the deed granting it is executed and recorded." Because the Department failed to record the maps and order "in a manner which would put a prospective owner on notice of the restriction," the court denied the State's request for restoration and dismissed the bill of complaint. The State took an appeal to the Court of Special Appeals.

---

7. Having decided to treat them as private wetlands because of the State's failure to show that they were below mean high tide, the circuit court deemed it unnecessary to determine whether, as Hirsch contended, the 1814 patent to Phillips had actually granted land under Cornfield Creek which was below mean high tide.

The Court of Special Appeals reversed the judgment of the circuit court. *Maryland Dep't v. Hirsch,* 42 Md. App. 457, 401 A.2d 491 (1979). First, the intermediate appellate court concluded that the trial court's finding that wetlands had been filled was not clearly erroneous. *Id.* at 471. Second, although agreeing with Hirsch that the Department had not complied with § 9-301 (c) when it failed to notify Mrs. Szymanski, the then record owner of these lots, that the order designating the lots as wetlands had been adopted, the court held that this failure did not render the private wetlands regulations invalid as to Hirsch. Because Hirsch was not the record owner of the lots at the time the notice was given, the Court of Special Appeals held that Hirsch did not have standing to complain of the Department's noncompliance with the Wetlands Act provisions in this regard. 42 Md. App. at 474-475. Third, the court rejected the trial court's conclusion that the recording provision in § 3-101 of the Real Property Article was applicable in these circumstances. The intermediate appellate court reasoned that § 3-101 speaks in terms of a "deed" imposing a restriction, which means a document between private parties rather than an administrative regulation. 42 Md. App. at 475-476.

Finally, the Court of Special Appeals held that § 9-301 (c), requiring that a copy of the order and maps establishing the wetlands boundaries "shall be filed among the land records," had been violated. 42 Md. App. at 479-480. The court stated that "filing" the maps in an inaccessible cabinet, and either misplacing or losing the order and the private wetlands regulations, was not compliance with the requirement that the order and maps be filed among the land records. However, the Court of Special Appeals took the position that it did not have to decide whether the noncompliance with § 9-301 (c) rendered the private wetlands regulations invalid as to Hirsch. In the court's view, even if the failure to properly file the order and maps meant that Hirsch had not been given notice from the *land records* that the property contained private wetlands and was subject to the regulations, Hirsch had received *actual notice,* before any

filling occurred, from Mr. Boone's telephone call to Mrs. Hirsch advising her that it would be necessary to secure a wetlands permit. 42 Md. App. at 483-484.[8] The Court of Special Appeals concluded that, because of this actual notice from the telephone call, Hirsch did not have "standing" to complain about a lack of notice resulting from the Department's failure to comply with the filing requirements of § 9-301 (c). 42 Md. App. at 484.

Thereafter, this Court granted both Hirsch's petition and the State's conditional cross-petition for a writ of certiorari. In the petitions and briefs, both sides have raised several arguments supporting their respective positions. In our view, however, most of these contentions need not be reached.

The principal, and we believe dispositive, argument raised by Hirsch is that the Department's failure to comply with § 9-301 (c)'s requirement to file the maps and order among the land records rendered the Anne Arundel County private wetlands regulations invalid during the times pertinent to this case. Consequently, Hirsch argues, the regulations cannot serve as the basis for an order compelling him to

---

**8.** As previously mentioned, the content of the telephone conversation between Mr. Boone and Mrs. Hirsch was disputed at trial. Mr. Boone testified that he informed Mrs. Hirsch that, although a wetlands violation had not occurred at that time, a wetlands permit would be required if any fill was to be placed on private wetlands. Mrs. Hirsch, however, testified that Mr. Boone did not mention the subject of wetlands, but only advised her that a grading or sediment control permit from *Anne Arundel County* might be required.

The trial court did not at any time expressly resolve the credibility issue presented by the dispute in the testimony about the actual content of the telephone conversation. In a comment in an introductory part of its opinion, the trial court did refer to a warning by a Water Resources Administration investigator to Mrs. Hirsch about the possible presence of wetlands on the property. However, this same comment of the trial court also stated that the warning did not occur until after some filling of the property had begun. At no place in its opinion did the trial court expressly make a finding that Hirsch had received actual notice before any filling of wetlands had occurred. Furthermore, it cannot be determined from the trial court's opinion, and the evidence is in conflict, whether Hirsch had received actual notice before he began filling wetlands. Consequently, if the critical question were whether Hirsch had received actual notice before any wetlands were filled, then the Court of Special Appeals should have remanded this case to the circuit court for a factual finding by the circuit court on this question. In light of our disposition of the case, however, that course is unnecessary.

restore the wetlands. The State, on the other hand, argues that the Court of Special Appeals erred in finding a violation of § 9-301 (c).

Section 9-301 (c) provides that a "copy of the order, together with a copy of the map depicting the boundary lines, *shall be filed among the land records* in every county affected." The State claims that this language does not mean that the maps and order were to be recorded or indexed in the land records. Rather, the State argues that the statute only required that the maps and order be delivered by the Department to the Clerk of the Court.

We disagree. Section 9-301 (c) does not say only that the maps and order should be filed in the clerk's office. If that were the language used, it might arguably be satisfied by a mere delivery of the maps and order to the clerk regardless of what may thereafter happen to them, although even then we would have serious doubts. The word "file" connotes something more than mere delivery to the clerk. As this Court observed in *Levy v. Glens Falls Indem. Co.,* 210 Md. 265, 273, 123 A.2d 348 (1956):

> "The word 'file' is derived from the ancient custom of filing or fastening writs and other exhibits on a wire or thread in courts and offices for safekeeping and ready reference. Thus a paper is said to be 'filed' when it is delivered to the proper officer and received by him to be kept on file. In modern usage, the 'filing' of a paper consists in placing it in the custody of the proper official who makes the proper indorsement thereon. The word 'filed' carries with it the *idea of permanent preservation of a paper so delivered and received, so that it may become a part of the public record."* (Emphasis supplied.)

However, the language of § 9-301 (c) expressly requires something more than filing with the clerk's office. The Legislature stated that the maps and order "shall be filed *among the land records."* (Emphasis supplied.) "Among" has been defined as "in or through the midst of"; "mixed or intermingled with"; and "surrounded by." Webster's New

International Dictionary, p. 88 (2d ed. 1961). The term "land records" has been used to refer to the books in which deeds conveying property are recorded. See § 3-301 (a) of the Real Property Article ("shall record every deed and other instrument affecting property in well-bound books to be named 'Land Records' "). Although the Legislature has used the words "land records" to refer to things other than the *deed* books, the term invariably means something permanent like a book. For example, § 3-109 of the Real Property Article provides:

> "Every clerk shall receive, index, and file in a *substantial loose-leaf book* linen-backed or other durable-backed copies of plats showing property or rights-of-way to be acquired or conveyed by the State Roads Commission and the State Highway Administration, and when *so filed and indexed, the plats shall be and constitute a part of the land records* of the county in which filed. . . ." (Emphasis supplied.)

Similarly, § 3-108 (b) of the Real Property Article provides:

> "If the owner of land in the state subdivides his land . . . and desires, for the purpose of description and identification, to record a plat of the subdivision among the *land records* of the county where the land lies, the clerk of the court shall accept and record the plat as prescribed in this section. . . ." (Emphasis supplied.)

Section 3-304 then states: "The clerk shall fasten securely one copy of each plat described under § 3-108 in a book provided for that purpose or shall record the plat."

We believe that the Legislature, by expressly stating that the maps and order "shall be filed among the land records," clearly intended that the maps and order were to be entered into some sort of permanent book, binder or file that would not only be accessible to, but would also likely be found by, one investigating the title to any land affected by the order. There may be several different methods of filing and

indexing which would comply with this standard. Nevertheless, placing the maps in a file cabinet in an area inaccessible to the public, with no references or index directing a title searcher to the drawer, was not compliance. We agree with the Court of Special Appeals that there was a violation of the Act's requirement that the maps and order be filed among the land records.

The next question concerns the effect of the violation of § 9-301 (c). The State argues that, notwithstanding any failure to properly file the maps and order, the private wetlands regulations are nevertheless valid and effective because the Act did not expressly condition their validity upon filing. As previously mentioned, the Court of Special Appeals did not decide whether the failure to file affected the validity of the regulations because it found that Hirsch had received actual notice of the presence of wetlands before the filling of wetlands had occurred, and therefore it concluded that he did not have standing to complain about the failure to file among the land records. We disagree with both positions.

The implicit premise of the Court of Special Appeals' "standing" analysis is that the purpose served by the statute's filing requirement was to give notice to existing landowners, who had not previously had notice, in order that they would be aware of the requirements of the regulations before they began any filling on their wetlands. Although this is a purpose of some of the other notice requirements in the Wetlands Act, it obviously is not the purpose of the requirement to file the maps and orders among the *land records*. The general purpose of the land records is not to inform existing property owners concerning what they may do on their property. They presumably know this from their deeds, statutory provisions, and other forms of notice. Instead, the purpose of the *land records* is to alert prospective purchasers, creditors or others contemplating the acquisition of some type of interest in the land. Thus, the preamble of the first Maryland statute broadly providing for registration of various documents among the land records recites that such registration "would very much tend to the

security of creditors and purchasers." Ch. 14 of the Acts of 1766, quoted in *Hays v. Richardson,* 1 G. & J. 366, 379 (1829). *See, e.g., Harbor Co. v. Smith,* 85 Md. 537, 543-544, 37 A. 27 (1897); *Hoffman and Flack, Adm'rs v. Gosnell, Trustee, et al.,* 75 Md. 577, 590, 24 A. 28 (1892); *Sitler, Ex'x v. McComas, et al.,* 66 Md. 135, 138, 6 A. 527 (1886); *Nelson v. Hagerstown Bank, et al.,* 27 Md. 51, 73 (1867); *U. S. Ins. Co. v. Shriver et al.,* 3 Md. Ch. 381, 383-384 (1851). Consequently, the obvious purpose of the statutory requirement that the private wetlands maps and order be filed among the land records was to provide notice to a *prospective* purchaser that the real estate was subject to the private wetlands regulations, so that the prospective purchaser would have the opportunity to consider whether he would want to acquire the affected property under these conditions.

Because the maps and order had not been filed among the land records as of the time Hirsch purchased the property, neither Hirsch nor other prospective purchasers at that time could have known that the five lots had been subjected to the private wetlands regulations. The property may have been unsuitable for Hirsch's intended purpose unless the private wetlands on the property could be filled. Therefore, if Hirsch had known that the wetlands could not be filled, or was unwilling to gamble that he could eventually obtain a permit, then Hirsch may not have purchased these lots. At the very least, he was denied the opportunity to make this decision. Consequently, Hirsch has standing to assert that the Department's failure to file the maps and order rendered the regulations affecting this property invalid.

Moreover, apart from his status as a prospective purchaser, Hirsch has contended that, because of the Department's failure to file the maps and order, the private wetlands regulations affecting his land were not validly promulgated and, therefore, are totally void. In this case, the Department is seeking a determination, based on those regulations, that Hirsch is liable for the restoration of his private wetlands to their previous condition. It would seem that a person may not be ordered to restore, or bear the costs

of restoration of, filled wetlands, if the administrative regulations allegedly prohibiting the filling were not validly promulgated, were void on their face, and thus were not in effect. The Wetlands Act itself appears to give standing to challenge a rule or regulation to "[a]ny person who has a recorded interest in land affected by any rule or regulation promulgated under this subtitle," §§ 9-304 and 9-305. For this reason also, we believe that Hirsch has standing to contend that the regulations are totally invalid because they were not promulgated in compliance with the statutory requirements.

The State contends that the private wetlands regulations are valid regardless of whether they were lawfully filed. The State initially argues that the restrictions imposed by the regulations on the use of private property are similar to zoning regulations, for which filing among the land records has not been construed as a condition precedent to their validity. However, there is no express requirement in the zoning laws that zoning restrictions must be filed among the land records. *See* Code (1957, 1978 Repl. Vol.), Art. 66B, § 1.00 *et seq.;* Art. 66D, § 7-108 *et seq.* Moreover, zoning regulations are generally applicable throughout a geographical subdivision, and, therefore, most persons are aware that a parcel of property in that county or municipality is subject to some form of zoning. In contrast, the private wetlands regulations are applicable only to the specific tracts of land affected by those regulations. Consequently, absent some form of notice such as filing among the land records, a prospective purchaser of such land would not be expected to know that the property had been subjected to the private wetlands regulations.

The State also argues that § 9-301 (c) does not expressly condition the validity of the private wetlands regulations on compliance with the mode prescribed for their promulgation. The State relies on *Quynn v. Carroll's Adm'r.,* 22 Md. 288 (1864), in which this Court held that the failure to record "among the records of the County" a certificate, as required by statute, attesting that a commissioner had taken the oath and was therefore qualified to take depositions, did not render the commissioner unqualified. The certificate had

been placed in a bundle of papers in the county circuit court clerk's office. The Court stated that the "filing of the paper in the proper office by the clerk, was a recording within the meaning of the Act." *Id.* at 294. The State urges that this case stands for the proposition that the failure to record or properly file an official document does not render the document invalid. We believe that *Quynn* is inapposite. As the Court of Special Appeals remarked in this case with respect to this very contention by the State, *Maryland Dep't v. Hirsch, supra,* 42 Md. App. at 482, "There is a significant difference between ensuring that adequate public notice is given of restrictions on the use of land and seeing to it that some record is made of the fact that a minor functionary has taken an oath of office."

Section 9-301 (c) clearly states that the maps and order "*shall* be filed among the land records." (Emphasis supplied.) In many recent cases, this Court has stated that "shall" is ordinarily presumed to have a mandatory meaning. *See, e.g., Kent v. State,* 287 Md. 389, 412 A.2d 1236, 1238 (1980); *In re James S.,* 286 Md. 702, 708, 410 A.2d 586 (1980); *State v. Hicks,* 285 Md. 310, 334, 403 A.2d 356 (1979), and cases there cited. Thus, in unambiguous terms, the Act mandated that the maps and order were to be filed among the land records. As previously discussed, the primary purpose of the statutory mandate was to notify prospective purchasers (and perhaps certain creditors or others interested in the property) that the property has been finally designated as containing private wetlands and was thereby subjected to the restrictions imposed by the regulations. If the Legislature had intended, as the State suggests, that the regulations were to be effective without the filing of the maps and order, then little purpose would be served by the statutory requirement. Such a construction would render the statutory language, and its underlying purpose, surplusage. This is a result which courts strive to avoid. *See, e.g., Collier v. Connolley,* 285 Md. 123, 132, 400 A.2d 1107 (1979), and cases there cited. Furthermore, conditioning the validity of the rules and regulations upon compliance with the statute's filing requirements would appear to be the only effective sanction for a failure to fulfill these requirements.

In determining the effect of the Department's default, it is noteworthy that the violation of the statutory requirements for promulgating the regulations went beyond the failure to file the maps and order among the land records. Section 9-301 (c), after directing the Secretary of Natural Resources to establish by order the bounds of each private wetland and the regulations applicable to it, and directing him to file the maps and order among the land records, goes on as follows:

> "The Secretary shall give notice of the order to each owner of record of any land designated as wetlands by mailing a copy of the order to the owner of record by registered or certified mail."

As earlier pointed out, it was not until eight months after signing the final order that the Secretary mailed the order to individual property owners. Then, instead of mailing the final order to the owners of record at that time, the Secretary used the same mailing list which had been compiled for sending notices of the proposed regulations ten months previously. It was because of this default that some of the existing private wetlands owners (and thus not only prospective purchasers like Hirsch) failed to receive notification that their land was subject to the regulations. Mrs. Szymanski, Hirsch's predecessor, fell into this category. Consequently, she was effectively denied her statutory right under §§ 9-304 and 9-305 to appeal the Secretary's final order to the Board of Review of the Department of Natural Resources and to seek judicial review in the courts. And Hirsch, as her successor, was deprived of any benefit which an appeal by Mrs. Szymanski might have accomplished. Moreover, if Mrs. Szymanski had known of the Secretary's order and decided not to take an appeal, at least she would have been able to inform Hirsch before the purchase that the property was encumbered by the regulations. Although it is not known whether in fact she would have done so, the Department's failure to notify her made it impossible.[9]

---

**9.** The Court of Special Appeals, while agreeing that the Secretary's failure to notify Mrs. Szymanski was a violation of the statute, held that Hirsch, not being the owner of record at the time, had no standing to complain of the violation. This holding is dubious, particularly in light of the possible impact upon Hirsch of the failure to notify Mrs. Szymanski.

In many situations where a statute mandates specific notice requirements in connection with finalizing proposed administrative action, this Court has held that the failure to comply with such requirements invalidates the administrative action. *See, e.g., Garrett County v. Bolden,* 287 Md. 440, 413 A.2d 190, 194 (1980); *Williams v. Public Service Comm'n,* 277 Md. 415, 354 A.2d 437 (1976); *Bethesda Management Serv. v. Dep't,* 276 Md. 619, 626-629, 350 A.2d 390 (1976); *Rasnake v. Bd. of County Comm'rs,* 268 Md. 295, 300 A.2d 651 (1973); *Md. Tobacco Grow. v. Md. Tob. Auth.,* 267 Md. 20, 296 A.2d 578 (1972). Of course, the effect of noncompliance in each case depends upon the legislative intent reflected in the particular statute involved and the nature of the violation.

In the present case, considering the mandatory language set forth in § 9-301 (c) of the Wetlands Act, and the legislative concern for the interests of private property owners and prospective purchasers, we believe that administrative compliance with the notification and filing requirements of § 9-301 (c) is a condition precedent to the validity of the regulations governing private wetlands. Because § 9-301 (c) had not been complied with at the time Hirsch filled his property, these 1973 purported regulations for Anne Arundel County private wetlands furnished no basis for ordering a restoration of the land to its prior condition.[10]

> *Judgment of the Court of Special Appeals reversed and the case remanded to that court with instructions to affirm the judgment of the Circuit Court for Anne Arundel County.*
>
> *The Maryland Department of Natural Resources, respondent and cross-petitioner, to pay costs.*

---

**10.** This holding disposes of all issues in the case with one exception. As indicated earlier in this opinion, the circuit court found as a fact that the State had failed to meet its burden of proving that any state wetlands had been filled, and that, therefore, all of the filled lands were private wetlands.

Both in the Court of Special Appeals and in this Court, the State has maintained that the circuit court's finding was in error. Because of its holding that restoration of the wetlands was required even if private wetlands were filled, the Court of Special Appeals stated that it need not reach the issue concerning state wetlands. However, the Court of Special Appeals, relying in part on evidence which the trial court did not consider, namely the 1814 patent, "observe[d]" that the circuit court's finding, that private wetlands only were filled, was not "clearly erroneous." 42 Md. App. at 472 n. 8.

Our review of the evidence, without considering the 1814 patent, convinces us also that the trial court's finding of fact cannot be deemed clearly erroneous under Maryland Rule 886. Moreover, if the patent be considered, it merely reinforces the trial court's ultimate finding of fact. Consequently, there is no merit to the argument that state wetlands were filled.